COMMONWEALTH vs. MIGUEL MOURE.

Hampden. October 5, 1998. - November 4, 1998.

Present (Sitting at Greenfield): WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Accessory and Principal. Homicide. Statute,* Construction. *Evidence,* Prior misconduct, Alibi, Consciousness of guilt. *Practice, Criminal,* Required finding, Instructions to jury, Capital case.

At the trial of an indictment for accessory before the fact to murder in the first degree, the Commonwealth's proof established the defendant's guilt beyond a reasonable doubt, and the judge correctly denied the defendant's motion for a required finding of not guilty. [315-316]

There was no merit to a criminal defendant's claim that he should have been indicted and tried as accessory before the fact to murder in the first degree under G. L. c. 274, § 3, rather than G. L. c. 274, § 2. [316-318]

At the trial of an indictment for accessory before the fact to murder in the first degree, the judge did not err in admitting evidence on redirect examination regarding a Commonwealth witness's motive to testify against the defendant, which had been raised on cross-examination and which consisted of bad acts attributable to a gang that the defendant directed, where the probative value of the evidence in rehabilitating the witness outweighed any prejudice to the defendant. [318-320]

No substantial likelihood of a miscarriage of justice arose, at the trial of an indictment for accessory before the fact to murder, from defense counsel's failure to request a consciousness of guilt instruction with respect to an inculpatory statement of the defendant, where the defendant's case was not prejudiced by what may have been a reasonable strategic decision by counsel. [320-321]

INDICTMENT found and returned in the Superior Court Department on May 25, 1995.

The case was tried before *Constance M. Sweeney,* J.

*Edward L. Hayden* for the defendant.

*Dianne M. Dillon,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury convicted the defendant as an accessory before the fact to murder in the first degree. Represented by new counsel on appeal, the defendant argues that his motion for

a required finding of not guilty should have been allowed. We reject the argument. The defendant also argues that he was improperly charged as an accessory because a principal felon had been acquitted of the murder before the defendant's trial; that evidence of prior bad acts prejudiced his defense; and that the lack of a jury instruction on consciousness of guilt evidence may have created a substantial likelihood of a miscarriage of justice. We reject these arguments as well. There is no basis to grant the defendant relief pursuant to G. L. c. 278, § 33E. See *Commonwealth* v. *Angiulo*, 415 Mass. 502, 507-510 (1993).

The defendant, known by the nickname "Polo," was, in May, 1994, president of the Springfield chapter of an organization known as Los Solidos (described in the testimony as a "gang"). Under the defendant's leadership, membership in Los Solidos became "stricter." The defendant's apparent goal was to keep the stronger members of Los Solidos (and weed out the weaker members), so the organization could survive an ongoing "war" with two rival organizations, "La Familia" and the "Latin Kings." Frankie Velasquez (nickname, "Frank Dog"), who was a founding member of Los Solidos, and a chief enforcer, testified about the defendant as president: "He's the man. He's the one who calls all the shots." Velasquez also testified that, "no missions or nothing should be done unless we get [the defendant's] consent."[1]

On or about May 27, 1994, the defendant met, at the apartment of Jessica Nieves, with members of Los Solidos, including Leyton Burgos (nickname, "Shaggy"); an enforcer, Erasmos Santos Vega (nickname, "Bootie"), a soldier; and Wilfredo Rosario (nickname, "Froggy"), another soldier. The defendant and the others agreed that a mission should be performed. Burgos "want[ed] five people hit." The defendant responded that he "want[ed] to start on Main Street" in Springfield. That site was rejected, when Vega told the others that Main Street was "too

---

[1]This is the governing structure the jury could have found from the testimony of Los Solidos members who were witnesses for the Commonwealth. In addition to a president, Los Solidos also had a vice-president, a "warlord," a treasurer, and one or more "chief enforcers," "enforcers," and "soldiers." The warlord "gets an order from the president and he carries it out" by "ha[ving] others do it." The warlord also procures the weapon or weapons necessary to complete an order. The chief enforcer and enforcers "discipline the brothers if they disrespect." Soldiers perform other duties, such as stealing automobiles for use in executing orders. The treasurer collected periodic dues from the members.

hot, cops were all over the place." The defendant, and the other members of Los Solidos, then turned their attention to Locust Street in Springfield as a site for the mission. Vega suggested that this area might also be unsuitable because "there were too many kids out there." The defendant rejected Vega's suggestion, stating, "Fuck the kids." The defendant went on to indicate that Los Solidos had "a break on [the victim]," the "godmother" of La Familia, and "we're going to make an example of her." The defendant directed the others with the following command: "I don't care if you get her [the victim] or not. Whoever is there, I better see it on the 11 o'clock news." Nieves heard the defendant indicate "[t]hat [Los Solidos] had a mission on Locust Street and [the victim] deserved to die."

The mission then proceeded on to completion. To use in the killing, Vega stole an automobile (which was disposed of after the murder by being abandoned and burned) from a shopping mall in Holyoke, and a handgun or handguns were obtained. On the night of May 28, 1994, Rosado, joined at this time by another member of Los Solidos, Jose Carrasquillo (nickname, "Galdie"), proceeded in the stolen automobile to Locust Street. As Rosado drove the automobile slowly down Locust Street, Carrasquillo, the front seat passenger, fired five or six shots from a handgun at a group of people (known, or perceived to be, associated with La Familia) who were talking in front of 190 Locust Street. Sylvia Ramirez, one of the assembled group, was hit and killed by a gunshot wound to the head.

Velasquez heard shortly after the murder that he was wanted for the murder of Sylvia Ramirez. Velasquez met with the defendant and told him that he (Velasquez) was going to turn himself in to the police, and that he needed money to hire a lawyer. The defendant informed Velasquez that he knew Velasquez had not committed the murder because he (the defendant) had directed "F. and G." to do it. The defendant explained to Velasquez that "F. and G." were, respectively, "Froggy" and "Galdie." These nicknames referred to Rosado (identified in the evidence as driving the stolen automobile during the shooting), and Carrasquillo (identified in the evidence as the passenger in the vehicle who fired the shots that killed Sylvia Ramirez).

1. This summary of the evidence, and other facts the jury were permissibly warranted in finding, demonstrates that, examined under the appropriate standard (*Commonwealth* v. *La-*

*timore*, 378 Mass. 671, 676-677 [1979]), the Commonwealth's proof established the defendant's guilt on the crime charged beyond a reasonable doubt. The judge correctly denied the defendant's motion for a required finding of not guilty.

2. The indictment charging the defendant as an accessory before the fact was framed under G. L. c. 274, § 2.[2] His appellate counsel argues at some length that the defendant should have been indicted and tried under G. L. c. 274, § 3,[3] because a principal felon, Carrasquillo, had been found not guilty of murder in the first degree prior to the defendant's trial. In support of this argument, the defendant relies on the provision in § 3, which states that an accessory before the fact "may be indicted and convicted of the substantive felony, whether the

---

[2]General Laws c. 274, § 2, reads: "Whoever aids in the commission of a felony, or is accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed, shall be punished in the manner provided for the punishment of the principal felon."

The indictment against the defendant reads, in pertinent part, as follows:

> "On or about May 28, 1994, at SPRINGFIELD in the COUNTY of HAMPDEN; JOSE CARRASQUILLO and/or WILFREDO ROSADO, JR., acting individually or in concert with each other, did knowingly and intentionally assault and beat Sylvia Ramirez with intent to murder her, and by such assault and beating did kill and murder the said Sylvia Ramirez.            ·

> "AND, THE GRAND JURY FURTHER PRESENTS THAT

> "MIGUEL MOURE of SPRINGFIELD in the COUNTY of HAMPDEN, defendant herein, before the said murder was committed, did incite, procure, aid, counsel, hire or command the said JOSE CARRASQUILLO and/or WILFREDO ROSADO, JR., acting individually or in concert with each other, to do and commit the said murder."

[3]General Laws c. 274, § 3, reads: "Whoever counsels, hires or otherwise procures a felony to be committed may be indicted and convicted as an accessory before the fact, either with the principal felon or after his conviction; or may be indicted and convicted of the substantive felony, whether the principal felon has or has not been convicted, or is or is not amenable to justice; and in the last mentioned case may be punished in the same manner as if convicted of being an accessory before the fact. An accessory to a felony before the fact may be indicted, tried and punished in the same county where the principal felon might be indicted and tried, although the counselling, hiring or procuring the commission of such felony was committed within or without·the commonwealth or on the high seas."

principal felon has or has not been convicted."[4] The defendant's trial counsel made no contention about the validity of the indictment, and he made no objection to the judge's instructions to the jury on the elements of the crime charged.[5] The defendant's argument, reduced to essentials, appears to be that the defendant was indicted and tried under the wrong statute (G. L. c. 274, § 2, as distinguished from § 3) and, as a consequence, he is entitled to have his conviction reversed, have a new indictment returned, and a retrial possibly held under a new indictment.

General Laws c. 274, §§ 2 and 3, are complementary statutes that seek to punish a defendant who "aids in the commission of a felony, or is accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed." The legislative background of the statutes, and their interrelationship, was discussed in *Commonwealth* v. *Ortiz*, 424 Mass. 853, 856-858 (1997). Section 2 defines the core offense, and § 3 states when and how an accessory before the fact may be tried. As we concluded in *Commonwealth* v. *Ortiz, supra* at 858, the "practical effect of [G. L. c. 274, §§ 2 and 3] is to hold the criminal actor who participates in a felony liable as a principal without regard to whether the felony is completed or committed by another. See 1 C. Torcia, Wharton's Criminal Law § 35, at 202-203 (15th ed. 1993) ('The person who aids, abets, commands, counsels, or otherwise encourages another to commit a crime is still regarded as a party to the underlying crime as at common law, even though the labels principal in the first degree, principal in the second degree, and accessory before the fact are no longer used, and even though it usually does not matter whether the aider and abettor is or is not present at the scene of the crime')." (Footnote omitted). The defendant was thus tried and convicted by the jury in all respects as a principal,

[4]The Commonwealth's brief indicates, however, that Rosado, the other principal felon named in the indictment, "has yet to be tried [but] has testified under oath that he directly participated in the murder of Sylvia Ramirez."

[5]The defendant's appellate counsel makes no argument in his brief that the jury instructions on the crime charged are erroneous. The instructions were in accordance with the manner in which the crime was charged in the indictment. Appellate counsel raised a point about the jury instructions at oral argument contending that they did not adequately inform the jury that the defendant, to be convicted as an accomplice to murder in the first degree, had to premeditate the killing along with the other principals. The instructions created no substantial likelihood of a miscarriage of justice in light of the evidence that warranted the jury's finding that the defendant had planned and ordered the murder.

without regard to his presence at the scene of the murder which was not a fact necessary to his conviction.

There is no significance in the fact that the Commonwealth proceeded against the defendant as an accessory under § 2 of G. L. c. 274, instead of directly on the substantive felony under § 3 of the statute. The defendant has shown no prejudice following from the manner in which he was charged and tried. It is settled law, as to principals in a crime, that the acquittal of one, and the conviction of the other, after separate trials, is no ground for objection by the defendant convicted. See *Commonwealth* v. *Valentin*, 420 Mass. 263, 275 (1995); *Commonwealth* v. *Todd*, 408 Mass. 724, 729-730 (1990); *Commonwealth* v. *Brown*, 378 Mass. 165, 173-174 (1979); *Commonwealth* v. *Podlaski*, 377 Mass. 339, 349-350 (1979). Indeed, the defendant's conviction under G. L. c. 274, § 2, is entirely consistent with one of the policy reasons for the modern rule that someone in the position of the defendant should be held liable as a principal under a statute punishing an accessory.[6] We reject the defendant's argument that he was improperly charged and tried.

3. As the testimony of Velasquez indicates, he was an important prosecution witness in proving that the defendant had directed the killing. During the direct examination of Velasquez, the prosecutor carefully avoided any reference to prior bad acts by Los Solidos members that might be attributed to the defendant. As might be expected, the defendant's trial counsel engaged in extensive cross-examination of the witness. The cross-examination, among other goals, sought to establish that Velasquez was testifying for the prosecution because he sought

---

[6]This reason is explained in a criminal law treatise:

"One of the greatest social menaces of the present day is the one who would be termed an accessory before the fact by the common law but in lay language is referred to as the 'brains' of a crime ring. He tends to put crime on a 'business basis,' he recruits members of the 'profession,' he provides the means by which crimes are perpetrated on an elaborate scale, and weapons so that death will result from any interference with his plans. The guilt of his terrified underlings, who carry out his commands because they dare not disobey, is certainly no greater than his. And it will not promote the general scheme of social discipline to handicap the prosecution of such an offender by unreasonable obstacles."

R.M. Perkins & R.N. Boyce, Criminal Law 764 (3d ed. 1982).

retribution against the defendant and the members of Los Solidos for setting him up to face the murder charge and not obtaining a lawyer for him. Defense counsel pointed out that Velasquez had delayed going to the police (the murder occurred in May, 1994, and Velasquez made contact with the police in February, 1995), and challenged him with the proposition "that when you went to speak to the police your motive, your reason for doing it is because you believed that members of the Los Solidos and specifically, [the defendant], set you up for the murder of [the victim]?" In attempting to fend off the proposition, Velasquez, during his cross-examination, stated to the defendant's trial counsel that he "didn't go to the police. . . until the day my car got shot up, sir," and acknowledged that he was "fearful of Los Solidos."

Based on this part of the cross-examination, the prosecutor sought and obtained the judge's permission (over the objection of the defendant's trial counsel) to present evidence in redirect examination of prior bad acts of Los Solidos members directed at Velasquez in order to establish what the Commonwealth contended was the witness's true motive in cooperating with the police. The prosecutor then brought out that Velasquez had been threatened by Los Solidos members who "were going to beat me up," and that in February, 1995, before he went to the police, Velasquez was in an automobile with his daughter and his former girl friend, when another vehicle followed his, and "when I pulled in my driveway they shot up my car." So, Velasquez testified, it was this shooting incident that finally motivated him to go to the police and give evidence about the murder. The judge carefully instructed the jury before the testimony was admitted that "it may only be considered by you for [the] very limited purpose regarding this witness'[s] state of mind and his motive for proceeding in a particular way, the issue having been raised on cross-examination." This instruction was repeated by the judge to the jury during her final charge.

The defendant argues that he should have a new trial because this testimony weakened his case significantly by tending to show that the Los Solidos organization was capable of organized violence. We consider the issue to have been adequately preserved for appellate review by the objections made by the defendant's trial counsel. While bad act evidence is not admissible to prove that a defendant has a propensity for criminal conduct, such evidence can be admitted for other relevant proba-

tive purposes, *Commonwealth* v. *Martino*, 412 Mass. 267, 280 (1992), and cases cited, after the judge balances its probative value against any prejudicial effect it may have. *Commonwealth* v. *Ferguson*, 425 Mass. 349, 354 (1997). The admission of the evidence generally is "a matter on which the opinion of the trial judge will be accepted on review except for palpable error." *Commonwealth* v. *Young*, 382 Mass. 448, 463 (1981). See *Commonwealth* v. *Martino, supra.*

The judge did not err in admitting the evidence. Velasquez's motive was directly put in issue by the defendant's trial counsel, and the cross-examination actually disclosed some of the bad act evidence in advance of the prosecutor's request to explore the subject on redirect examination. At the end of the cross-examination, the Commonwealth had a "serious need to rehabilitate its primary witness," *Commonwealth* v. *Richardson*, 423 Mass. 180, 187 (1996), and the judge rightly decided that the probative value of the evidence outweighed the possibility of prejudice, especially because the jury would receive focused cautionary instructions on the proper consideration of the testimony. It should be kept in mind as well that, at the point in the trial when Velasquez testified, the jury had heard evidence about the nature of Los Solidos's activities and the jury reasonably could infer that members who failed the organization might be dealt with harshly. The fact that the bad acts testified to by Velasquez were not directly attributed to the defendant is of no significance. In the context of the evidence which warranted the jury's finding that the defendant was the directing force behind Los Solidos' missions, a basis was established for the jury to connect the bad acts to the defendant. We conclude that the issue provides no reason for a new trial.[7]

4. The defense raised the issue of alibi. His trial counsel called six witnesses who testified, in substance, that, on May 27, 1994, when the murder was planned, the defendant was at his grandmother's house, and that, on May 28, 1994, when the murder was committed, he was at a family christening. A videotape of the christening showed the defendant at the recep-

---

[7]The defendant also points to what he considers to be other bad act evidence that was brought out in the testimony of other witnesses. We have considered the testimony in question and conclude that it does not support the defendant's argument that, when considered with the evidence given by Velasquez, a new trial must be ordered. The other evidence simply repeated the possibility that members of Los Solidos might retaliate against someone who provided information to the police.

tion. The defendant gave pretrial statements to the police which were generally supportive of his alibi. During questioning by the police, however, he contradicted his alibi by stating that he had been in Nieves's apartment on May 27 when the meeting was held. It is now argued that his statements to the police could be considered as evidence of consciousness of guilt, and that the failure of his trial counsel to request an instruction on consciousness of guilt created a substantial likelihood of a miscarriage of justice.

There is no merit to the argument. The lack of an instruction on the subject did not prejudice the defendant's case. His trial counsel may very well have made a strategic decision not to call the jury's attention to the inconsistencies in the defendant's statements, and to concentrate instead on undermining the credibility of the prosecution witnesses, especially Velasquez, and to raise the issue of alibi through the defense case. See *Commonwealth* v. *Simmons*, 419 Mass. 426, 435-436 (1995).

5. There is no reason to grant the defendant relief pursuant to G. L. c. 278, § 33E. The evidence of his guilt is substantial, and the murder was a senseless act committed in furtherance of the code of unlawful behavior governing Los Solidos.

*Judgment affirmed.*