## COMMONWEALTH *VS.* PETER CRUZ.

Hampden. May 7, 2004. - August 9, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Search and Seizure,* Arrest, Probable cause, Exigent circumstances. *Constitutional Law,* Search and seizure, Arrest, Probable cause, Admissions and confessions. *Probable Cause. Arrest. Practice, Criminal,* Admissions and confessions, Capital case. *Evidence,* Admissions and confessions. *Homicide.*

Although certain police officers violated the Fourth Amendment to the United States Constitution and art. 14 of the Declaration of Rights of the Massachusetts Constitution when they gained entry into a criminal defendant's home without an arrest or a search warrant and in the absence of exigent circumstances, this court applied its holding in *Commonwealth* v. *Marquez,* 434 Mass. 370, 377 (2001), rendering admissible statements made at a police station to which a defendant had been taken after an illegal arrest, and concluded that its holding in *Marquez* also included statements made at a police station by a defendant in this defendant's circumstances, even though the defendant was not arrested in his home, where the defendant conceded that he received, and understood, his Miranda warnings, and where there was no connection between any unlawfully obtained evidence and statements made at the station. [306-309] COWIN, J., with whom MARSHALL, C.J., joined, concurred.

There was no merit to a criminal defendant's contention that the Commonwealth's promises of leniency to cooperating witnesses at the defendant's trial violated the witness intimidation statute, G. L. c. 268, § 13B; nor, in the circumstances, was there merit to the defendant's contention that the testimony of the witnesses should have been excluded because promises of consideration by the Commonwealth in return for their cooperation rendered the testimony "irretrievably unreliable." [309-311]

INDICTMENTS found and returned in the Superior Court Department on August 26, 1999.

A pretrial motion to suppress evidence was heard by *C. Brian McDonald,* J., and the cases were tried before *Daniel A. Ford,* J.

*Evan Slavitt (Richard O'Neill* with him) for the defendant.

*Dianne M. Dillon,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. On July 16, 1999, Luis Torres was shot and killed while chasing two masked assailants who had robbed him at gunpoint. The defendant was indicted on a charge of being an accessory before the fact to felony murder based on his participation in the planning of the robbery, and he was subsequently convicted by a jury of that charge.[1] An important part of the Commonwealth's evidence against the defendant was the testimony of two witnesses given pursuant to written cooperation agreements. On appeal, the defendant argues that an incriminating statement made to police at the police station was the result of an unlawful entry into his home and, thus, was inadmissible "fruit of the poisonous tree." The defendant also argues that the Commonwealth's promises of leniency to the cooperating witnesses rendered their testimony unreliable and, thus, the testimony should have been excluded. We reject the defendant's arguments. We also discern no reason to exercise our authority under G. L. c. 278, § 33E, either to reduce the verdict or to order other relief. Accordingly, we affirm the defendant's conviction.

The evidence presented by the Commonwealth permitted the jury to find the following facts, which we set forth in some detail. In July of 1999, the defendant, then forty-one years of age, lived with his girlfriend, Yolanda Goyco, and their young daughter in a rented apartment in Holyoke. The defendant's nineteen year old son, Peter, Jr. (also known as Pedro), was visiting from his home in Puerto Rico. The defendant was not employed and collected Social Security benefits. The defendant needed money because his family was about to be evicted for nonpayment of rent. The defendant spent a substantial amount of time with two friends, Brayan Madera, who was eighteen years of age, and Joseph Gonzalez, who was seventeen. Much

---

[1]The defendant also was convicted by the same jury on an indictment charging him with being an accessory before the fact to armed robbery while masked. Because the facts supporting this conviction supplied the underlying basis for the murder conviction, the judge properly recognized the duplicative nature of the two offenses and dismissed the conviction of the lesser charge. See Commonwealth v. Mello, 420 Mass. 375, 398 (1995); Commonwealth v. Berry, 420 Mass. 95, 113-114 (1995).

of this time was spent at Madera's home.[2] The defendant and Madera sold drugs from there, and Gonzalez testified that he smoked marijuana there. Madera kept a black pellet, or BB, gun at his home, as well as a .22 caliber handgun that the defendant had sold to Gonzalez earlier that summer.[3]

Goyco had been employed for approximately one year as a supervisor and cashier at Ocean State Job Lot, one of a chain of outlet stores, located in the K-Mart Plaza in Holyoke. The defendant and Goyco knew that every evening after the store closed, the store's assistant manager, Luis Torres, drove to the Fleet Bank on Northampton Street in Holyoke to deposit that day's receipts. He usually left the store between 9:30 and 10 P.M. Store policy dictated that a minimum of two employees were required to make the nightly deposits, and, on Wednesday evenings, it usually fell to Goyco to accompany Torres to the Fleet Bank. When she did so, she often would travel with the defendant in his blue Ford Escort automobile, following Torres, who drove alone in his own vehicle. The defendant and Goyco would watch to ensure Torres's safety as he made the bank deposit, and then drive away.

On Wednesday, July 14, 1999, after observing Torres make a routine bank deposit, the defendant joined Gonzalez, Madera, and his son at Madera's home. The defendant, who was high on drugs, announced that he had a "good ass plan." He told the others that Torres made deposits at the Fleet Bank on Northampton Street every evening, and that it would be "real easy" to rob him by just pointing a gun at him to scare him. According to the defendant, Torres was easily frightened and would not chase them.

The next afternoon, the defendant, his son, Gonzalez, and

---

[2]The Commonwealth's evidence showed that Brayan Madera, who had a history of being placed in foster homes, was staying, in July, 1999, in the owners' apartment of a two-family house. For simplicity, this opinion will refer to it as Madera's home.

[3]Pedro Cruz testified that he had delivered the handgun, on behalf of his father, to Gonzalez in an envelope. Gonzalez testified that the defendant personally had given him the handgun, together with fifty bullets in a medicine bottle. Gonzalez subsequently gave the handgun to Madera to keep because, he testified, if his parents had discovered it at his home, he "would have got into trouble."

Madera again gathered at Madera's home. The defendant asked Gonzalez whether he wanted to participate with Madera in the robbery of Torres. The defendant suggested that it could be done with one person watching whichever store employee accompanied Torres, while the other robbed Torres of the money. Madera displayed his BB gun, and Gonzalez agreed to help. The defendant, Madera, and Pedro Cruz then drove to the K-Mart Plaza, where the defendant identified a white Honda in the parking lot as belonging to Torres.

On Friday, July 16, the defendant and his son arrived together at Madera's home.[4] The defendant announced that this was the night the robbery would take place because there would be a lot of money to deposit on Friday. He cautioned Gonzalez and Madera to "put fear in" Torres. The defendant instructed Gonzalez, who was wearing light colored clothes, to go home and change into darker clothes because he "st[u]ck out." Gonzalez complied and returned with a backpack in which to put his dark clothes after the robbery.[5] When Gonzalez returned, Madera was wearing dark jeans and a "Desert Storm" hat. The defendant watched as Madera gave Gonzalez the BB gun and kept the .22 caliber handgun for his own use. The defendant gave Gonzalez his pager and told Gonzalez and Madera that he would signal with "all fives" when Torres left the K-Mart Plaza parking lot on his way to the bank.

The defendant then drove Madera and Gonzalez past the bank, and the defendant pointed out a house on Lynwood Street where he would be waiting for them after the robbery. On the way back to the bank, the defendant reminded Madera and Gonzalez to make sure that Torres was scared when they pulled out their guns. Madera and Gonzalez then got out of the defendant's car and hid behind a tree. Gonzalez, armed with the BB gun, had a bandana covering his face. Madera, armed with the .22 caliber handgun, was also masked.

---

[4]The defendant's cousin was caring for his daughter; he had told Goyco that he was going to New Jersey.

[5]The backpack, later recovered and turned over to police investigators, also contained Gonzalez's season pass to a local amusement park, where Gonzalez had visited, with his family, earlier in the day. It was the season pass that led police officers investigating the murder to Gonzalez, and, eventually, to the defendant.

As the defendant watched from the parking lot, Torres left the store that night carrying a bag containing that day's store receipts. He was accompanied by another employee of Ocean State Job Lot, Michael Sullivan. The defendant sent the prearranged pager signal to Gonzalez and Madera and, a few minutes later, drove by the bank and honked his horn to signal that Torres was on his way. Torres's white Honda automobile soon pulled up to the bank and parked. As Torres walked toward the night deposit box, Gonzalez and Madera ran up behind him, masks on and guns waving. Gonzalez pointed his gun at Torres and grabbed the deposit bag. Madera pointed his gun at Sullivan, still in the Honda. Madera and Gonzalez then fled on foot. Torres got back into the Honda and pursued them, honking his horn.

When Madera and Gonzalez arrived at the designated meeting place, the defendant was not there. The two men separated. Torres chose to follow Madera (who was smaller than Gonzalez) and, leaving his vehicle, jumped a fence and ran into a backyard. Sullivan, in pursuit just behind Torres, heard two shots. Torres died minutes later from a gunshot wound to the chest.

On July 21, Gonzalez arrived at the Holyoke police station, accompanied by his parents. He gave a statement to police officers admitting his own participation in the robbery and naming the defendant as a participant involved in the planning of the robbery. As a result of Gonzalez's statement, three detectives received instructions to locate the defendant. They proceeded to his address in order to interview him. Before they did so, at least one of them was informed that the defendant was known to have some suicidal tendencies.

When the officers arrived at the defendant's apartment shortly after 3:30 P.M., they found a note to Goyco taped to the front door indicating that the defendant had gone to a hospital. All of the shades were drawn, and an air conditioner on the second floor was running. The officers knocked loudly on the front and back doors for about five minutes. When there was no response from within, one officer telephoned the nearest hospital and learned that the defendant was not registered there. Another officer spoke with neighbors who told him that they had not seen

the defendant all day. One officer noticed a blue automobile parked in front of the defendant's address, and he confirmed that the vehicle was, in fact, registered to the defendant. The officers eventually gained entry into the defendant's home when a maintenance worker at the housing complex agreed to use his pass key to unlock the front door.

Finding no one on the first floor, the detectives (who were in plain clothes) went upstairs and approached the closed door of a room from which they heard the humming of the air conditioner. They opened the door and saw a man and a young child who appeared to be asleep on a mattress on the floor. Because the man's hands were hidden under a pillow, and there was a possibility that he could be armed, two of the officers drew their guns. One officer moved the pillow aside, and, observing that the man was not armed, both officers holstered their guns. The man awoke, acknowledged that he was Peter Cruz, and agreed to accompany the officers to the police station to answer some questions. The defendant was not handcuffed nor was he under arrest. He appeared calm and alert and asked only that the police find someone to care for the child, whom the defendant identified as his daughter.

The officers were unsuccessful in locating a caretaker for the defendant's daughter.[6] On the way to the police station, the officers purchased a "Happy Meal" for the child and a soda for the defendant at a local McDonald's restaurant. Once at the station, arrangements were made for a family member or friend to come for the child. The defendant, meanwhile, sat with his daughter while she watched television and ate her meal. There were no officers in the room with them, and the defendant was not questioned until after the child had left the station.

At about 5:10 P.M., the defendant was advised of his Miranda rights and of his right to use the telephone. The defendant then gave a statement (his first) to police, in which he denied any participation in the robbery. When he had completed making

---

[6]The officers stopped at the home of one of the defendant's friends, whom the defendant suggested could watch the child, but no one responded to an officer's knock.

the statement, he was told that police had some more questions for him.[7] The defendant agreed to wait at the police station.

Approximately one and one-half hours later, the defendant received Miranda warnings for the second time that night.[8] The defendant was advised that Gonzalez had implicated the defendant in the robbery[9] and that records from the defendant's pager would demonstrate its use as a signal device. The defendant then told the police officers that he was involved in the robbery, but that he did not intend that anyone get hurt. He agreed to give a second statement, this time admitting his participation in the crime.

At trial, Gonzalez described in detail the defendant's role in the planning of the robbery. With respect to the murder weapon, Gonzalez testified that the defendant "knew we had the .22 caliber that he gave me." He also testified to the following events after the robbery, and Torres's murder, in connection with the defendant's participation in the crime. According to Gonzalez, the bank deposit bag contained approximately $6,000 in cash and some checks. He and Madera divided the money equally between them.[10] On Sunday, Gonzalez had a chance encounter with the defendant and his son at a convenience store. The defendant told Gonzalez that he "believed" Gonzalez had some money for him. The defendant stated (in Gonzalez's words) that "he [the defendant] [was] the one that came up with the plan and that it was his idea; that he's the one that suggested the scheme, so he felt he should get some money." Gonzalez told him "no because he wasn't there." Although the defendant explained that he had been arrested while waiting for Gonzalez and Madera to complete the robbery, Gonzalez testified, "I knew that he was lying."

---

[7]At some point in the course of making his first statement, or immediately thereafter, the defendant indicated to police officers that he was diabetic and needed to take insulin at 7 P.M. He immediately was assured that this would be arranged, and the defendant, in fact, did take his insulin at the prescribed time.

[8]At 10:30 P.M., the defendant also was advised of, and waived, his right to a prompt arraignment.

[9]The defendant might have known that Gonzalez was at the police station that night, because, as he was escorted to the men's room, the defendant passed by an open door of the room where Gonzalez was being interviewed.

[10]Gonzalez admitted that he spent a substantial portion of his $3,000 share on clothes and jewelry at the Holyoke Mall that weekend.

Pedro Cruz testified at trial against his father. He described his own role in the robbery as that of a bystander, who, while playing video games, heard only portions of conversations in which the defendant, Gonzalez, and Madera planned the robbery.[11] According to Pedro Cruz, his father wanted to rob Torres himself, but needed help from Gonzalez and Madera because he had a bad back. He testified that, before leaving Madera's home on the night of the robbery, the three men "slapped hands" and said, "Let's go."

The defendant, testifying on his own behalf, portrayed a very different picture of the events. He testified that the plan to rob Torres originated with Madera, Gonzalez, and a third person, Tony Gonzalez,[12] who was a member of a gang and "dangerous." The defendant further testified that he at first refused to participate in the armed robbery, and eventually agreed only because Gonzalez, Madera, and Tony threatened him and his family. According to the defendant, he was afraid that the three men were going to hurt his family, or even shoot him, if he refused to participate. We now turn to the merits of the appeal.

1. The defendant moved to suppress "any statements and all other evidence, whether obtained directly or indirectly as a result" of the warrantless entry by police officers into his home. A judge in the Superior Court (a different judge from the judge who presided at trial) conducted an evidentiary hearing on the motion. The motion judge's findings essentially mirror the Commonwealth's evidence at trial, set forth above, with respect to the officers' entry into the defendant's home and the subsequent questioning of the defendant at the police station. The motion judge's determinations that (1) the purpose of the police in going to the defendant's home was to locate the defendant and to determine his willingness to talk about the robbery and murder; (2) their entry into the defendant's home was motivated by the intent to uncover incriminating evidence; and (3) the circum-

---

[11]When questioned during cross-examination regarding his failure to be truthful in his original statements to police officers, Pedro Cruz stated, "physically and mentally I didn't consider myself to be part of that group."

[12]Pedro Cruz testified to the presence of a man named Tony at Madera's home while the plans for the robbery were being discussed, but did not implicate him as an active participant.

stances did not satisfy the exigency exception to the warrant requirement, are well supported. The judge reasoned, however, that, once the defendant arrived at the police station, the illegal entry notwithstanding, the behavior of the police toward the defendant comported with constitutional requirements. The judge concluded that the police did not exploit their illegal entry to obtain an incriminating statement, but that the administration of Miranda warnings, not once but twice; the passage of four hours between the illegal entry and the defendant's incriminating statement; the manner of interrogation; and the intervening confrontation of the defendant with the fact that Gonzalez had implicated him in the robbery, which occurred after the defendant made an exculpatory statement, but before he made his self-incriminating statement, "combined to attenuate the illegality of the [police] entry and purged the defendant's self-incriminating statement of the primary taint." We agree with the judge's conclusion and add two observations:

a. The judge correctly decided that the situation facing the police did not justify their entry into the defendant's home. Although the officers had some knowledge bearing on the fact that the defendant could have been at risk of suicide, it is plain that the officers went to the defendant's home to question him and not to ensure his safety. The Commonwealth does not now challenge the judge's conclusion that "the police officers did not have a good faith belief that the defendant was in imminent danger of death or serious injury." The police officers plainly crossed permissible constitutional bounds when they gained entry into the defendant's home, entered the defendant's bedroom, and drew their weapons, as the defendant and his young daughter slept. Entry into the defendant's home in this manner, without an arrest or a search warrant and in the absence of exigent circumstances, violated the Fourth Amendment to the United States Constitution and art. 14 of the Declaration of Rights of the Massachusetts Constitution. See *Payton* v. *New York*, 445 U.S. 573, 576 (1980); *Commonwealth* v. *Sanna*, 424 Mass. 92, 96 (1997). It does not follow, however, that statements made by the defendant at the police station should have been suppressed.

b. The motion judge did not have the benefit of *Com-*

monwealth v. *Marquez*, 434 Mass. 370, 377 (2001), which was decided one month after he issued his written memorandum and order denying the defendant's motion to suppress, in which we adopted, under art. 14, principles stated in *New York* v. *Harris*, 495 U.S. 14 (1990), that "where the police have probable cause to arrest a suspect, the [Fourth Amendment's] exclusionary rule does not bar [the admission] of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of [his rights]." *Id.* at 21. The facts of this case differ slightly from those in *Marquez*, because the defendant was not arrested at his home, as was the defendant in *Marquez*. There is no question, however, that our holding in *Marquez*, which renders admissible statements made at a police station where a defendant has been taken after an illegal arrest, also includes statements made at a police station by a defendant in this defendant's circumstances.[13] We repeat, essentially, what was said in *Marquez*: "upholding otherwise valid statements given by defendants at the police station after . . . an invalid [entry], will not cause the police to ignore the *Payton* rule [prohibiting police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest, see *Payton* v. *New York, supra*]. The penalty for an unlawful [entry] in[to] a defendant's dwelling is the suppression of anything seized at the time of the [entry], either from the defendant or in the dwelling, and any statements made at the time of the [entry]." *Commonwealth* v. *Marquez, supra* at 378. A statement made at the station may still be suppressed under a fruit of the poisonous tree analysis, of course, where a connection exists between unlawfully seized evidence or an unlawfully obtained statement, and the statement

[13]The motion judge found that the defendant's consent to accompany the officers to the station was not freely given, but was the result of the police officers' exploiting their illegal entry, and, thus, invalid. The defendant, on the other hand, conceded, first in his original statement made to police officers and, again, in his testimony at trial, that he voluntarily agreed to go with the officers to the police station for questioning. We need not resolve the issue of the propriety of the defendant's presence at the police station. Because, as stated above, the principles expressed in *Commonwealth* v. *Marquez*, 434 Mass. 370, 377 (2001), are controlling, the challenged statements are admissible regardless whether the defendant's presence at the police station was coerced or an act of his own free will.

made at the station. See *Commonwealth* v. *Pietrass*, 392 Mass. 892, 902 (1984). There was no such connection in this case. The defendant concedes that he received, and understood, his Miranda warnings. The motion properly was denied.[14]

2. Prior to trial, the defendant filed a motion to dismiss, or, in the alternative, to exclude the testimony of Gonzalez and Pedro Cruz, both of whom testified pursuant to cooperation agreements, on the ground that their testimony was procured by the Commonwealth in violation of the witness intimidation statute, G. L. c. 268, § 13B.[15] The judge who ruled on the motion to suppress properly denied the motion without a hearing. The legislative purpose of G. L. c. 268, § 13B, is to protect witnesses from being intimidated or harassed so that they do not become reluctant to give truthful evidence in investigatory or judicial proceedings. See *Commonwealth* v. *Drumgoole*, 49 Mass. App. Ct. 87, 90 (2000) (recognizing larger statutory purpose to prevent interference with administration of justice). An essential element of the crime is the offer of a bribe or the use of intimidation, force, or the threat of force. See *Commonwealth* v. *Henderson*, 434 Mass. 155, 157-158 (2001); *Commonwealth* v. *Belle Isle*, 44 Mass. App. Ct. 226, 229 (1998). Here, as in essentially all such cooperation agreements, the witness has a valid privilege not to testify under the Fifth Amendment to the United States Constitution. Offers of leniency, or of a particular resolution of the witness's own potential criminal culpability, are made to encourage the witness to waive the privilege and to testify at trial. The Commonwealth expects — and cooperation agreements often explicitly state — that the

---

[14]The defendant's motion to suppress, on its face, included both statements that he gave to the police. The judge's memorandum addressed only the second. Both statements were admitted in evidence at trial. No objection was raised at trial, nor does the defendant now claim error in the admission of his first statement, in which he stated he "accepted to come down to the police station" and in which, by his own testimony, he lied in denying any knowledge of the robbery.

[15]General Laws c. 268, § 13B, provides in relevant part as follows:

"Whoever, directly or indirectly, willfully endeavors by . . . intimidation, force or express or implied threats of force to influence, impede, obstruct, delay or otherwise interfere with . . . any person furnishing information to a criminal investigator relating to a violation of a criminal statute . . . shall be punished . . . ."

witness will give truthful testimony. Such agreements do not "interfere" with a witness, G. L. c. 268, § 13B, nor do they run afoul of any of the statute's underlying purposes. The defendant cites no authority for his proposition that the Commonwealth violated the statute, and, to the extent that he still raises the issue, the claim merits no further discussion. See *McCone* v. *New England Tel. & Tel. Co.*, 393 Mass. 231, 236 (1984), citing Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

The defendant also claims that the testimony of Gonzalez and Pedro Cruz should have been excluded because promises of consideration by the Commonwealth in return for their cooperation rendered it "irretrievably unreliable." We disagree. This court has recognized that "testimony pursuant to a plea [or cooperation] agreement, founded on a promise of truthful cooperation, and the . . . agreement itself are admissible." *Commonwealth* v. *Ciampa*, 406 Mass. 257, 261 (1989). See *Commonwealth* v. *Marrero*, 436 Mass. 488, 499-502 (2002); *Commonwealth* v. *Rivera*, 430 Mass. 91, 95-99 (1999); *Commonwealth* v. *Meuse*, 423 Mass. 831, 832 (1996); *Commonwealth* v. *Sullivan*, 410 Mass. 521, 524-525 (1991). In the *Ciampa* decision, we set forth guidelines to be used when a witness testifies pursuant to an agreement with the Commonwealth, in order to minimize the risk that the jury will believe the witness because the Commonwealth, in effect, appears to have guaranteed the truth of the witness's testimony. See *Commonwealth* v. *Ciampa*, *supra* at 264-266. These guidelines were followed in this case.

The nature of the challenged testimony was made known to the jury from the outset of trial. In his opening statement, the prosecutor explained that they would hear testimony from Gonzalez and Pedro Cruz pursuant to cooperation agreements with the Commonwealth. The prosecutor's questioning of Gonzalez during direct examination elicited the fact that Gonzalez had been charged with armed robbery and murder for his participation in the crime, and that Gonzalez had agreed with the Commonwealth to provide evidence against the defendant with the understanding that his cooperation would be taken into

consideration when the charges against him were resolved.[16] See *id.* at 264. During cross-examination, the defendant persistently challenged Gonzalez's credibility and elicited from him his expectation that he likely would be allowed to plead to a reduced charge, or receive a more lenient sentence, because he had agreed to testify against the defendant.

The questioning of Pedro Cruz proceeded along similar lines. On cross-examination, the defendant elicited Pedro Cruz's agreement that he repeatedly had denied any knowledge of his father's involvement in the robbery, and had altered his story only after he entered into the cooperation agreement with the Commonwealth.[17] There was no hint of improper vouching. See *id.* at 265. See also *Commonwealth* v. *Marrera, supra* at 501; *Commonwealth* v. *Dixon,* 425 Mass. 223, 233 (1997). Finally, the judge issued a cautionary instruction, as required by *Commonwealth* v. *Ciampa, supra* at 266, in his final charge. He told the jury that they should "study the testimony of each of these two witnesses with particular care."

The jury's attention clearly was focused on the possibility of bias. The credibility of Gonzalez and Pedro Cruz was a key issue at trial, but the defendant aggressively explored inconsistencies in their testimony and thereby did all he could to weaken the strength of the Commonwealth's case in the jury's eyes. In his closing statement, the defendant argued forcefully to the jury that Gonzalez and Pedro Cruz should not be believed because they had been given a "great deal" by the Commonwealth. "The issue of credibility raised by such inconsistencies 'is a question for the jury to decide.'" *Commonwealth* v. *Medeiros,* 395 Mass. 336, 353 (1985), quoting *Commonwealth* v. *Clary,* 388 Mass. 583, 589 (1983).

---

[16]The trial transcript indicates that the prosecutor sought to introduce a copy of the written cooperation agreement between Gonzalez and the Commonwealth, but the judge sustained an objection to this evidence. The agreement subsequently was marked for purposes of identification only and was not before the jury.

[17]The written cooperation agreement between Pedro Cruz and the Commonwealth was marked for purposes of identification but was never offered in evidence. The record shows that each written agreement was in the form of a letter addressed to the respective attorney of Gonzalez or Pedro Cruz, on the letterhead of the office of the district attorney, and signed by an assistant district attorney, the witness, and his attorney.

3. Although the defendant was not tried on an indictment charging murder in the first degree, or convicted of murder in the first degree, the consequences of his convictions are the same. The "practical effect of [G. L. c. 274, §§ 2 and 3] is to hold the criminal actor who participates in a felony liable as a principal without regard to whether the felony is completed or committed by another." *Commonwealth* v. *Ortiz*, 424 Mass. 853, 858 (1997). See *Commonwealth* v. *Benjamin*, 358 Mass. 672, 680 (1971). The defendant thus is entitled to plenary review under the standard set by G. L. c. 278, § 33E, in which we examine the appellate record to determine whether there were any errors on the part of the defendant's trial counsel, the prosecutor, or the judge, that were likely to lead to a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Francis*, 432 Mass. 353, 354 n.1 (2000); *Patrick P.* v. *Commonwealth*, 421 Mass. 186, 193 (1995); *Commonwealth* v. *Angiulo*, 415 Mass. 502, 509-510 (1993).

We conclude that there is no ground on which to order a new trial or to reduce the level of his guilt. The defendant's presence at the murder scene was not a fact necessary to his conviction. See *Commonwealth* v. *Moure*, 428 Mass. 313, 317-318 (1998). The jury obviously believed the Commonwealth's evidence establishing that the defendant masterminded the plan to rob Torres that led to the fatal shooting. The fact that this evidence included testimony procured pursuant to cooperation agreements with the Commonwealth and that was, in part, contradictory, provides no basis for § 33E relief. Nor is the knowledge that others who carried out the plan may have received lesser sentences for their involvement a permissible basis on which to reduce the defendant's sentence. See *Commonwealth* v. *Cintron*, 435 Mass. 509, 525-526 (2001); *Commonwealth* v. *Allen*, 430 Mass. 252, 259 n.6 (1999); *Commonwealth* v. *Valentin*, 420 Mass. 263, 275 (1995). The defendant received a fair trial and the jury's verdict is consistent with the evidence.

*Judgment affirmed.*

COWIN, J. (concurring, with whom Marshall, C.J., joins). Recognizing that *Commonwealth* v. *Marquez*, 434 Mass. 370, 377 (2001), is the law, I continue to disagree with the holding in that case. *Id.* at 379 (Cowin, J., dissenting). I concur in the result reached by the court because the motion to suppress was rightly denied on another ground. The evidence was not obtained by "exploitation of [the primary] illegality [but] instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun* v. *United States*, 371 U.S. 471, 488 (1963), quoting Maguire, Evidence of Guilt 221 (1959). The motion judge correctly concluded that the confession was the product of the defendant's free will based on a consideration of the relevant factors set forth in *Brown* v. *Illinois*, 422 U.S. 590, 602-604 (1975), and *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 258 (1982), including (1) the giving of Miranda warnings, (2) the temporal proximity of the arrest and the confession, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct. The statement was thus sufficiently attenuated from the illegal act to be "purged of the primary taint," see, e.g., *Commonwealth* v. *Fredette*, 396 Mass. 455, 459 (1985), and was therefore independently admissible.