NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-10079

COMMONWEALTH  vs.  DENNIS M. BATEMAN.

Franklin.     December 9, 2022. - July 17, 2023.

Present:  Budd, C.J., Lowy, Cypher, Kafker, & Georges, JJ.

Homicide.  Constitutional Law, Conduct of government agents.
    Evidence, Disclosure of evidence, Exculpatory, Third-party
    culprit.  Perjury.  Jury and Jurors.  Practice, Criminal,
    Capital case, Conduct of government agents, Disclosure of
    evidence, Voir dire, Instructions to jury, Conduct of
    prosecutor, Argument by prosecutor, Venue, Jury and jurors,
    Duplicative convictions.

Indictments found and returned in the Superior Court
Department on July 8, 2005.

The cases were tried before John A. Agostini, J., and a
motion for a new trial, filed on August 31, 2018, was heard by
him.

Amy Codagnone for the defendant.
Thomas H. Townsend, Assistant District Attorney, for the
Commonwealth.

GEORGES, J.  In the early evening on April 16, 2005, Brandy

Waryasz, who was seven months pregnant, was killed during a

robbery at her place of employment, a gasoline station in

Deerfield.  Her viable, unborn son, who would have been named Dane Anthony Hall, also was killed.  Two years later, following a jury trial, the defendant, Dennis M. Bateman, was convicted of murder in the first degree for the killing of Waryasz, on theories of premeditation and felony-murder; murder in the first degree for the killing of Hall, on a theory of felony-murder; and armed robbery.  Now before us is the defendant's consolidated appeal from his convictions and from the subsequent denial of his motion for a new trial.

On appeal, the defendant claims an extensive list of errors in connection with the trial and other proceedings below.  We affirm, except as to the armed robbery conviction, which, as the Commonwealth concedes, must be dismissed as it is duplicative of the felony-murder conviction for the killing of Hall.  We also have conducted a review of the record and fail to determine any ground for granting relief pursuant to G. L. c. 278, § 33E.

Background.  1.  Facts.  We summarize the facts the jury could have found,[1] while reserving certain facts for discussion of the relevant issues.

_____

[1] In our summary of facts that the jury could have found, we have considered the evidence in a light most favorable to the Commonwealth.  See Commonwealth v. Kostka, 489 Mass. 399, 400 (2022).  In certain instances, we have included an identification of a particular actor -- for example, Brandy Waryasz, or the defendant -- in our description of a specific event or scene, although there was no direct evidence that the

On Saturday, April 16, 2005, twenty-one year old Brandy Waryasz, who was thirty to thirty-two weeks pregnant, was working a shift from 2 P.M. to 9 P.M. as the sole attendant at a gasoline station located in Deerfield. The station had two islands for pumping gasoline, one self-serve and one full-serve, as well as a building housing two vehicle service bays and an adjoining retail office. In the retail office, there was a customer service counter on which sat a cash register and a machine for processing credit card payments.

At approximately 3 P.M., the defendant, a forty year old African-American man with a history of "crack" cocaine use, was at his home in neighboring Greenfield. He was short on money, but his wife had gone away for the weekend and, in his own words, he was looking to "party." With that in mind, he set off in his distinctive 1988 Ford Econoline van. The van originally had been white, but the defendant had painted it using cans of black spray paint that he had purchased from the "paint guy" at a Greenfield automobile parts store. As a result, the van had a faded, dark black or blue primer-like look to it. The van's

_____

specified actor was Warysaz (or the defendant), because the evidence presented would have permitted the jury to draw that inference. We also have included similar identifications of a vehicle as the defendant's van in this summary because, again, despite the lack of direct evidence to that effect, a rational jury could have inferred from the evidence presented that the vehicle in question was the defendant's van. See Commonwealth v. Rakes, 478 Mass. 22, 32 (2017).

engine leaked oil, such that it would leave stains behind when it stopped and made a loud knocking sound that became more pronounced as the van accelerated.  The van also had been equipped with an extended rooftop, as though it had been converted for camping or for transporting a wheelchair user.

A little after 3 P.M., the defendant stopped at a Greenfield gasoline station and convinced the attendant to give him ten dollars' worth of gasoline on his "tab" because he had no money.  Next, he stopped at a Greenfield liquor store, where, at 3:30 P.M., he purchased a single can of beer for $1.25 and, as would be discovered later upon review of footage captured by the store's video surveillance system, stole a $4.49 bottle of liquor.  He then drove onto Interstate Highway 91 and headed south toward Springfield.  Eventually, however, he ended up at the Deerfield gasoline station.[2]

The defendant had been to the Deerfield gasoline station before and, as he later revealed, was aware that it was not equipped with video surveillance cameras.[3]  He also was familiar

---

[2] The defendant originally told police he exited Interstate Highway 91 in Whately in search of a gasoline station because his van had "acted up" on the way to Springfield.  When police noted that there were gasoline stations closer to the Whately exit than the station in Deerfield, he amended his answer and suggested he "must have" exited in Deerfield.

[3] At a cookout two days later, the defendant stated that he had been at the Deerfield station on April 16 at around 5 P.M.

with Waryasz.  When he arrived, the defendant parked his van in front of the station building, not at the fuel pumps.  While it is unclear exactly when he arrived and whether he had left at one point and returned,[4] several customers, whose presence was confirmed by credit card receipts processed between 6 P.M. and 6:24 P.M., observed his "loud," "dark," "dull-colored" van with the "bad paint job" at the station.  As a security officer from a nearby school drove by on his rounds at 6:15 P.M. or 6:20 P.M., he also observed the "black," "not shiny" van with the "raised roof," like "what a camper or handicapped van might have," parked in front of the station building.

While at the station, the defendant raised the hood on his van, filled the oil in the engine, and secured a container of water from Waryasz, claiming that he might need it for his radiator.[5]  One customer, while fueling his vehicle at the self-

_____

or 6 P.M., and that he expected to be "set up" for the murders, although he noted "that they wouldn't know who it was because there was no video cameras in the [station]."

[4] One self-serve customer recalled having seen the defendant in his van parked in front of the building at the station as early as 5 P.M.  While paying for his gasoline in the retail office, the customer overheard the defendant, from his van, ask Waryasz in a "loud, stern voice" whether she was "going to be there or not?"  To which she replied, "I don't know.  I'm not sure."  Another customer, meanwhile, "heard a quite loud noise" and saw the defendant's van enter the station at approximately 6 P.M.

[5] The defendant told police that the van's engine had stalled out right as he pulled into the station.  While the

serve island, also saw the defendant walking around in the retail office, at one point even venturing behind the counter where the cash register was located, all while Waryasz was outside waiting on a full-serve customer. Then, when the customer went inside to pay with his credit card, he heard the defendant ask Waryasz for change for a one-dollar bill, which caused her to open the cash register. The defendant also asked Waryasz for a cigarette, noting that he had not had one "since [he] left Springfield." Eventually, the self-serve customer was able to pay and went to depart. As he drove out of the station, shortly after 6:24 P.M., Waryasz and the defendant were standing outside smoking cigarettes.

By chance, the "paint guy" from the Greenfield automobile parts store, who well remembered selling the defendant the cans of black spray paint for his van, drove by the station minutes later, at approximately 6:30 P.M. As he drove by, he recognized the defendant's "Ford Econoline conversion van" because of "the spray can paint job on it." It was still parked in front of the station building. He also saw Waryasz standing in the door to the retail office, facing the defendant who was standing outside

engine did have a history of stalling if it overheated, it seemed to run when the defendant wanted it to, and witnesses who had been passengers in the van earlier on April 16 said it had been running fine.

in front of his van.  There were no other vehicles at the station.

Over the next several minutes, during a lull in customers, the defendant attacked Waryasz, tightly wrapping a ligature -- a black nylon-like belt or strap -- around her neck and tying it in a knot in the rear.  He then left her lying in one of the station service bays, grabbed the cash register off the counter, put it in his van, and drove away.  Fresh oil stains were found on the pavement where his van had been parked.

At approximately 6:42 P.M., another self-serve customer entered the retail office to pay for his gasoline.  Finding no one, he looked into the adjoining service bays and observed Waryasz's body on the ground.  He immediately called police, who responded along with emergency medical personnel.  However, it already was too late to save Waryasz.  The ligature had choked off Waryasz's airflow, rendering her unconscious within seconds and stopping her heart within minutes.  In turn, her viable unborn son was deprived of oxygen and died within minutes of his mother.

The cash register and the $350 that had been in it were never recovered.  The defendant, meanwhile, had driven back to Greenfield, stashed his van in a parking lot behind a downtown building, and proceeded to "party" all night, at multiple locations, in the company of a series of different companions.

Over the course of the night, he was observed with "lots of money" and purchased, among other things, $250 worth of crack cocaine, which he and his companions proceeded to smoke.  Also, on more than one occasion that night, he asked people to make sure his family was taken care of "if anything happen[ed] to him" because he had "messed things up."

In the days that followed, the defendant approached additional individuals and pressed them to confirm that he was in Greenfield at or about the time of the murders.  All those whom he approached, however, had seen him on April 16 before or after the time of the murders.[6]  He also proceeded to tell multiple people that he had been at the gasoline station on April 16 and that his fingerprints likely would be found on Waryasz's pocketbook; he claimed he had asked her for change and she allowed him to go into her pocketbook to get it, while she went outside to wait on a full-serve customer.[7]

Two days later, during an interview of the defendant by police in connection with their investigation of the April 16 station incident, the defendant told the interviewing officers that, while he was at the station, he and Waryasz engaged in

_____

[6] The defendant was not seen back in Greenfield until 7 P.M. or shortly thereafter, when he made his first purchase of crack cocaine for the evening, at a cost of one hundred dollars.

[7] No fingerprints belonging to the defendant were recovered from Waryasz's pocketbook.

"horse play" with a belt or strap that she pulled out from under the counter:  "She was flinging the thing at me and I was grabbing it and pushing it back and stuff like that."  Police, however, had yet to publicly disclose that Waryasz had been strangled.[8]  Unwittingly, the defendant had revealed that he had knowledge about the details of the crime, and the murder weapon (i.e., the ligature) in particular, that only the perpetrator would have, and also that he was concerned about fingerprint or other forensic testing that ultimately might link him to the same.

Later in the investigation, a deoxyribonucleic acid (DNA) profile was generated from biological material found on the ends of the ligature where it had been tied behind Waryasz's neck. The profile was analyzed and found to contain a mixture of DNA. The defendant's DNA matched the major profile in that mixture. The probability that the DNA profile of a randomly selected African-American individual would match the major profile was approximately one in 605 quadrillion of the African-American

---

[8] The defendant first told an officer about the alleged "horse play" with "a black belt" while outside smoking a cigarette during a break in an interview on April 18, 2005.  At the time, the officer did not know how Waryasz had been murdered.  The defendant then made a point of repeating the story about "playing around" with a "black, long, thin belt-like strap" to another officer who drove him home from the interview. The second officer was aware that Waryasz had been strangled.

population. A quadrillion is a million times the population of the world.

The defendant also was a potential contributor to a mixture of DNA recovered from clippings of Waryasz's fingernails. The probability of a randomly selected, unrelated individual having contributed DNA to the mixture was approximately one in 207,000 of the African-American population. Along with fresh abrasions found on Waryasz's elbow and knee, the DNA on her fingernails suggested that Waryasz had attempted to fend off the defendant's attack.

2. Procedural history. On July 8, 2005, the defendant was indicted for the murders of Waryasz and her unborn child, Hall, as well as for armed robbery. On May 25, 2007, after a twelve-day jury trial, he was convicted on all charges. The defendant timely appealed. Eleven years later, on August 31, 2018, he filed a motion for a new trial, in which he made many of the same arguments raised here on appeal. The motion was remanded to the Superior Court. On August 30, 2019, after an evidentiary hearing, the same judge who presided at the trial denied the motion in a written decision that included detailed findings of fact. The defendant appealed from the decision, and that appeal

was consolidated here with the direct appeal from his convictions.[9]

Discussion. 1. Standard of review. Where, as here, we consider the "defendant's direct appeal from a conviction of murder in the first degree together with an appeal from the denial of a motion for a new trial, we review the whole case under G. L. c. 278, § 33E." Commonwealth v. Goitia, 480 Mass. 763, 768 (2018). "We therefore review raised or preserved issues according to their constitutional or common-law standard and analyze any unraised, unpreserved, or unargued errors, and other errors we discover after a comprehensive review of the entire record, for a substantial likelihood of a miscarriage of justice." Commonwealth v. Upton, 484 Mass. 155, 160 (2020). An error creates a substantial likelihood of a miscarriage of justice if it was "likely to have influenced the jury's conclusion" (citation omitted). Id. We address the defendant's arguments in the order presented.

2. Statements to jailhouse witnesses. Before he was indicted, the defendant was being held in the Franklin County

---

[9] On December 4, 2020, the defendant filed a second motion for a new trial in this court. The motion was remanded to the trial judge for disposition. The defendant sought to stay further consideration of the present appeal until that motion was decided, but we denied the request. The defendant has included in his brief filed in this appeal arguments made in that second motion for a new trial. Those arguments are not part of the present appeal.

house of correction after an arrest on other charges. While there, he made incriminating statements relative to the murders to two fellow detainees, Anthony Bogacz and Debric Sweeney, both of whom subsequently testified at the murder trial pursuant to cooperation agreements. Prior to trial, the defendant moved for voir dires of these two witnesses and to exclude their testimony on grounds that they were acting as agents of the government when the statements were made and, thus, violated his right to counsel. The trial judge denied the motion. In his subsequent motion for a new trial, the defendant again raised and expanded on the claim, but the trial judge again denied the motion following an evidentiary hearing. The defendant claims the judge erred on both occasions. We disagree.

We review the relevant background. At the evidentiary hearing, which was limited to the issue whether Bogacz was a government agent, the defendant called, among others, the lead trial prosecutor and two State police investigators, Detective Lieutenant John Gibbons and Sergeant Danial Wildgrube, both of whom had testified at trial. Based on his assessment of their testimony and credibility, as well as on his assessment of the evidence and credibility of the relevant witnesses from the trial, the trial judge made certain findings. See Commonwealth v. Grace, 370 Mass. 746, 752-753 (1976) (trial judge entitled to rely on knowledge and evaluation of evidence from trial in

deciding motion for new trial). We accept those findings where they are supported by substantial evidence and defer to the judge's assessment of the credibility of witnesses. See Commonwealth v. Tate, 490 Mass. 501, 505 (2022). We pay special deference to the judge's findings in this case because he also presided over the trial. See Commonwealth v. Chatman, 466 Mass. 327, 334 (2013), S.C., 473 Mass. 840 (2016).[10]

On April 20, 2005, Bogacz and Sweeney were arrested as part of a large law enforcement operation targeting drug dealers and users in Greenfield, and thereafter were detained at the house of correction. A week later, on April 27, 2005, Gibbons and Wildgrube went to visit with Bogacz, having learned from sources that he had supplied drugs to the defendant. During the interview, Bogacz confirmed that, in fact, he had sold the defendant crack cocaine on five successive days, including a $150 sale on April 16, hours after the murders.[11] No promises, rewards, or inducements were provided to Bogacz during the interview.

---

[10] We have supplemented the trial judge's findings with undisputed evidence from the record that is not contrary to the judge's rulings. See Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).

[11] The defendant previously purchased one hundred dollars' worth of crack cocaine from another dealer immediately after the murders.

On May 3, 2005, six days after the officers' visit to Bogacz, the defendant was arrested on charges of larceny under $250, G. L. c. 266, § 30 (1), and being a common and notorious thief, G. L. c. 266, § 40, in connection with his theft of the $4.49 bottle of liquor on the afternoon of April 16. Upon his arrest, he was taken to the district attorney's office in Greenfield, provided with his Miranda rights, and interviewed by Gibbons and another member of the State police. During the interview, the defendant's attorney called and advised him not to speak any further, whereupon the interview ended. The defendant was then booked, arraigned, and held at a house of correction.[12]

A day or two later, the defendant saw Bogacz walking by his cell and called out. Bogacz, who had been unaware of the defendant's arrival, went over, and the two proceeded to engage in conversation, during which the defendant pressed Bogacz to act as an alibi witness and tell police that he had seen the defendant between 4 P.M. and 6 P.M. on the day of the murders. The following day, they talked again at the defendant's cell. The defendant was emotional and said that "he was fucked, and if

---

[12] The defendant was arraigned in the District Court on the larceny-related charges on May 4, 2005, and held subject to $10,000 cash bail. On May 19, 2005, after being indicted on the same charges, he was arraigned in the Superior Court and again held subject to $10,000 cash bail.

[Bogacz] did[ not] help him out he was going to spend the rest of his life in jail." He told Bogacz that he knew Waryasz and had gone to the station with the intention of convincing her to play along with his plan to rob the station to "get money for coke," but, when she refused, he murdered her. The defendant suggested that he had been drunk, and it was all just an accident. Bogacz refused to go along with the defendant's plan; he and the defendant had conducted their drug transaction on April 16 late at night after the murders, not between 4 P.M. and 6 P.M.

On May 5, 2005, Bogacz placed a telephone call to Gibbons from the house of correction to report that the defendant had asked him to provide an alibi and to request a transfer out of the house of correction, away from the defendant; however, Gibbons was not available. The next day, May 6, Bogacz managed to reach Gibbons by telephone, told him that the defendant now had confessed to the murders, and again requested a transfer. Gibbons told Bogacz he would come down to talk to him. When Gibbons and Wildgrube arrived at the house of correction later the same day, they informed Bogacz that they could not offer him any promises, rewards, or inducements. As a result, Bogacz refused to talk to the officers without his lawyer. Concerned for his own safety, he also continued to request a transfer, away from the defendant.

On June 28, 2005, Bogacz, now accompanied by his lawyer and having been transferred out of the house of correction, met with Gibbons and Wildgrube and provided them with the details of what the defendant had told him.  No promises, rewards, or inducements were provided to Bogacz at that time; however, approximately two years later, on April 27, 2007, Bogacz and the Commonwealth did enter into a cooperation agreement.  In return for Bogacz's testimony at the defendant's trial, the Commonwealth agreed to take his cooperation into consideration in resolving criminal matters pending against him, not to proceed against him on a pending indictment for being a habitual offender, and not to use against him any statements he made at the trial regarding selling crack cocaine to the defendant in the hours after the murders.  Pursuant to the agreement, Bogacz testified at the trial regarding that drug transaction and the statements made by the defendant in the house of correction.

As for Sweeney, he had no contact with authorities regarding the defendant until June 1, 2005.  At that time, Sweeney disclosed to Gibbons and another State police officer details of interactions he had had with the defendant several weeks earlier, shortly after the defendant's arrival at the house of correction.  Sweeney knew the defendant, having sold him crack cocaine two days before the murders.  When they later encountered one another in the house of correction, they fell

into conversation, during which the defendant mentioned that police considered him a person of interest in connection with the murders.  The defendant admitted to Sweeney that he had been at the gasoline station on April 16 -- claiming his van had broken down -- and that he and Waryasz knew one another and were "playing around and stuff."  He further explained that he was having trouble establishing his whereabouts at the time of the murders, and asked Sweeney to help him out by lying and saying he was at Sweeney's house drinking beers and watching television on April 16 between 4 P.M. and 6 P.M.  After initially agreeing, Sweeney changed his mind and declined to sign a written statement that the defendant prepared.  When he did so, the defendant became angered and threatened to tell police about the time Sweeney had sold him crack cocaine unless Sweeney relented and signed the statement.  When Sweeney continued to refuse, however, the defendant said, "I'm not going to use you, just forget it."

Following the June 1 interview, Sweeney had no further contact with authorities regarding the defendant and the murders until May 2007, when he received a summons to appear and to testify at the defendant's trial.  On May 17, 2007, Sweeney entered into a cooperation agreement, whereby he agreed to testify at the defendant's trial in return for the Commonwealth's agreement to take into consideration his

cooperation in resolving criminal matters pending against him, and not to use against him any statements he might make at the trial regarding his sale of crack cocaine to the defendant.  At the trial, Sweeney testified about that drug sale, as well as about the statements and threat made by the defendant in the house of correction.

a.  Agents of the government.  The defendant first argues that the statements he made while in the house of correction should have been suppressed because Bogacz and Sweeney were acting as government agents at the time and, thus, violated his right to counsel under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, as well as his invocation of his right to counsel pursuant to Miranda v. Arizona, 384 U.S. 436, 475 (1966).  When a right to counsel attaches or is invoked, as the case may be, "government agents may not 'deliberately' elicit statements from a defendant outside the presence of counsel." Commonwealth v. Foxworth, 473 Mass. 149, 157 (2015), citing Massiah v. United States, 377 U.S. 201, 206 (1964).  "This rule applies not only to overt interrogation by government officers, but also to 'indirect and surreptitious' interrogation by persons acting as government agents." Foxworth, supra, citing Commonwealth v. Harmon, 410 Mass. 425, 428 (1991).  "Whether someone is an agent of the government . . . depends on the circumstances of each

case." Foxworth, supra. While we accept the trial judge's findings of fact absent clear error, we independently apply constitutional principles to determine whether Bogacz and Sweeney were government agents. See Commonwealth v. Caruso, 476 Mass. 275, 280-281 (2017).

"The United States Supreme Court has not clearly defined the point at which agency arises." Commonwealth v. Murphy, 448 Mass. 452, 460 (2007). At the very least, "there must be some arrangement between the Commonwealth and the informant before the informant's actions can be attributed to the Commonwealth." Caruso, 476 Mass. at 282. Put another way, "where there is an 'articulated agreement containing a specific benefit,' an agency relationship has been established." Murphy, supra at 460, quoting Commonwealth v. Reynolds, 429 Mass. 388, 394 (1999). Accordingly, someone "who is paid by the government for incriminating evidence" or "who receives a promise of the recognition of cooperation" and thereafter deliberately elicits statements from a defendant is a government agent. Foxworth, 473 Mass. at 157, citing United States v. Henry, 447 U.S. 264, 271 (1980), and Reynolds, supra at 394 & n.7. The agreement or promise need not be express, and, instead, "may evolve[] by implication from the conduct of the parties" (citation and quotation omitted). Foxworth, supra at 158. With that said, "someone who has not entered into any agreement with the

government, and who reports incriminating evidence to police out of conscience or even an unencouraged hope to curry favor is not acting as a government agent" (citation and quotations omitted). Id.

The defendant argues that the government sowed the seeds for Bogacz and Sweeney to act as agents when, at the police station on April 20, 2005, police asked individuals arrested during the large drug sweep whether they had information regarding the April 16 murders of Waryasz and Hall. As an initial matter, however, there is no evidence in the record before us that either Bogacz or Sweeney was questioned about the murders when they were arrested on April 20. Even assuming they were, mere knowledge of the government's desire for information about a crime does not turn an individual into a government agent. See Harmon, 410 Mass. at 430 (where only action attributable to government was suggestion that inmate "keep his ears open" when around defendant, no agency relationship established). Again, some express or implied agreement or arrangement promising rewards or inducements in return for information is required. See Murphy, 448 Mass. at 465 (jailhouse witness was government agent where he had "specific agreement" with prosecutor to file motion to reduce sentence on provision of "substantial assistance" to government). As of April 20, therefore, Bogacz and Sweeney, at most, had

unencouraged hope that they could curry favor with the government by providing information regarding the April 16 murders.

For an agency relationship to exist, the agreement or arrangement between the government and the witness, be it express or implied, must have arisen prior to the elicitation of information from the defendant. See Caruso, 476 Mass. at 282 ("No agency relationship exists in the absence of a prior arrangement between the Commonwealth and the informant"). In Sweeney's case, he did not meet or communicate with anyone from the government until he was visited by Gibbons and another State police officer on June 1, 2005, weeks after the defendant had asked him for an alibi and then threatened him when he refused to do so. Accordingly, even if Sweeney reached an agreement or arrangement with the government at the June 1 meeting, a proposition not supported by evidence, no agency relationship existed at the material time.

As for Bogacz, he had three relevant interactions with the government. First, there was his April 27, 2005, meeting with Gibbons and Wildgrube at the house of correction,[13] but no

---

[13] The defendant maintains that an agency relationship already existed between Bogacz and the government by the time of the April 27, 2005, interview, based on two prior occasions when Bogacz had provided information to authorities. Some twenty-five years earlier, in the 1980s, Bogacz had provided

promises, rewards, or inducements were offered to him at that time. Accordingly, no agency relationship arose from that meeting.[14]

Bogacz next communicated with police on May 4, 2005, when he called Gibbons by telephone from the house of correction, seeking to provide information on an unrelated narcotics matter. Gibbons responded that he would pass on the information to the officers working on that matter. He also told Bogacz that he had talked to the assistant district attorney and passed on the information Bogacz had provided on April 27 regarding his sale of crack cocaine to the defendant. The defendant attaches great significance to this, but the mere assurance that information has been or will be passed along does not create an agency relationship. See Commonwealth v. Tevlin, 433 Mass. 305, 320

_____

information to Gibbons after being arrested for a series of home burglaries, although Gibbons did not provide Bogacz with anything in return for that information and did not speak to prosecutors on Bogacz's behalf. In addition, twelve years earlier, in 1993, Bogacz had cooperated with the Hampden County district attorney's office after being arrested in connection with a bank robbery. Bogacz's prior interactions with the government, however, do not serve to establish that he was a government agent in 2005. See Caruso, 476 Mass. at 282 (fact that informant provided information in past does not establish agency relationship).

[14] There is no evidence that, at the April 27 meeting with Bogacz, Gibbons or Wildgrube "tipped off" that the defendant would soon be arriving at the house of correction. Of course, even if they had, that alone would not have been enough to establish that Bogacz was a government agent. See Harmon, 410 Mass. at 430.

(2001) (no agency relationship where trooper made no promise and merely said she would take information to district attorney's office). Gibbons did not tell Bogacz that the assistant district attorney was prepared to provide anything in return for past or future information. Instead, Gibbons, who had been directed by the assistant district attorney not to offer any promises, rewards, or inducements to Bogacz, merely reported, "[W]e're going to see what your status is." In other words, Bogacz's status with the government had not changed. Notably, there was no mention during the May 4 telephone call of the defendant's presence at the house of correction, even though he had arrived there by that time, or any suggestion from Gibbons that Bogacz should track the defendant down and probe for information about the murders. In the end, therefore, there was nothing about the May 4 telephone call that transformed Bogacz into a government agent.

Finally, there was Bogacz's May 5 telephone call, in which he was looking to report to Gibbons on the defendant's initial request for an alibi and to express his own desire for a transfer out of the house of correction. Gibbons was not available to take the telephone call, however, and the State trooper who answered merely suggested that he would have Gibbons "get in touch with" Bogacz. No promises, rewards, or inducements were offered to Bogacz during this extremely brief

exchange.[15]  Nor was there anything about the telephone call that gave rise to an implied agreement or arrangement with the government.  As the May 5 telephone call was the last contact Bogacz had with anyone from the government before the defendant confessed to the murders, there is no basis for concluding that Bogacz was acting as an agent of the government when that occurred.[16]

The defendant has further argued that the statements made to Bogacz and Sweeney should have been excluded because they were the product of an unethical ruse orchestrated by the prosecutor.  Specifically, he maintains that the prosecutor had him arrested on May 3, 2005, on "dubious legal grounds" for the

---

[15] The defendant suggests that the State trooper who answered the telephone on May 5, 2005, somehow agreed to transfer Bogacz out of the house of correction in return for the information he was prepared to provide.  We disagree.  The call lasted only a matter of seconds, during which the trooper seemed intent on simply taking a message for Gibbons and ending the conversation.

[16] Having concluded that Bogacz and Sweeney were not government agents when the defendant made the inculpatory statements, we need not consider whether the defendant's Sixth Amendment or art. 12 right to counsel had attached by that time with respect to the murders and armed robbery.  Nor need we consider whether the defendant's invocation of his Miranda right to counsel at the May 3 postarrest custodial interrogation continued to protect him at the time, and in the circumstances, that the statements were made.

theft of the bottle of liquor,[17] rather than for the murder of Waryasz and Hall, so that he could be detained in the "informant-rich environment" at the house of correction and preyed upon for information about the murders without fear of violating his right to counsel with respect to those more serious charges. To be sure, it would be a violation for the government to intentionally create a situation likely to induce a defendant to make incriminating statements in the absence of counsel after the right to counsel has attached. See Caruso, 476 Mass. at 281-282, citing Henry, 447 U.S. at 274; Harmon, 410 Mass. at 428. However, even if the defendant had established everything else necessary to advance his argument as formulated, he still would have to establish that Bogacz and Sweeney were government agents when the statements at issue were made. See Henry, supra at 270-275 (statements suppressed where inmate, who was government agent, engaged defendant, fellow inmate in same prison, in conversation). Again, this he has failed to do.

---

[17] The defendant filed a motion to dismiss in the "liquor bottle" case, arguing that there was no probable cause for the charges of larceny under $250 and being a common and notorious thief. A Superior Court judge (not the trial judge in the present case) denied the motion, having expressly concluded that there was probable cause to initiate the charges. The defendant did not seek an interlocutory appeal from that ruling; eventually, the case was nol prossed after he was convicted of the murders.

Having viewed the entire record, we are satisfied that the Commonwealth did not engage "in any conduct in contravention of its 'affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.'"  Caruso, 476 Mass. at 284, quoting Murphy, 448 Mass. at 467.[18]  The testimony of Bogacz and Sweeney was properly admitted.

b.  Undisclosed evidence.  The defendant next argues that he must be granted a new trial for what he alleges is the Commonwealth's failure to produce specifically requested exculpatory information relevant to the jailhouse witnesses.  To prevail on these claims, he must show that the undisclosed evidence existed and was exculpatory, he made a specific request for it, the prosecution failed to produce it, and a "substantial basis exists for claiming prejudice from the nondisclosure."  Commonwealth v. Lykus, 451 Mass. 310, 326 (2008), quoting Commonwealth v. Tucceri, 412 Mass. 401, 412 (1992).  See Commonwealth v. Ferreira, 481 Mass. 641, 650 (2019), S.C., 490 Mass. 1002 (2022), quoting Commonwealth v. Imbert, 479 Mass.

_____

[18] While we "have recognized that art. 12 may provide broader protection of the right to counsel than the Sixth Amendment in circumstances in which 'the informant has an articulated agreement with the government that contains a specific benefit or promise,'" Caruso, 476 Mass. at 281 n.3, quoting Murphy, 448 Mass. at 467, we did not ascertain a reason to extend such protection in Caruso, and we conclude that it is not warranted in the circumstances in this case.

575, 582 (2018) (burden can be met by showing "reasonable possibility" that "nondisclosed evidence would have made a difference").  The verdict and judgment must be set aside unless the reviewing court's "conviction is sure that the error did not influence the jury, or had but very slight effect." Commonwealth v. Ellison, 376 Mass. 1, 24-25 (1978), quoting United States v. Agurs, 427 U.S. 97, 112 (1976).  We review each claimed violation.

   i.  Undisclosed Sweeney evidence.  As Sweeney acknowledged at trial, he had pleaded guilty in November 2005 -- prior to entering into his cooperation agreement -- to five counts of distributing cocaine and had been sentenced to eighteen months in a house of correction, followed by three years of probation. At the time of the defendant's trial, Sweeney no longer was incarcerated but was still on probation.  After trial, the defendant learned that a notice of surrender and hearing for an alleged violation of probation had issued on April 19, 2007, due to Sweeney's failure to report to his probation officer since March 27, 2007.  No hearing resulted, and Sweeney's probation, from which he timely was discharged on May 4, 2009, was not revoked.  Based on this information, the defendant alleges that Sweeney was facing revocation of his probation at the time he testified on May 17, 2007, and that there was an undisclosed deal between the prosecution team and probation service to keep

the violation hanging over Sweeney's head as motivation to cooperate. The assertion is purely speculative and contradicted by documents in the record, which indicate that the violation was disposed of the same day it issued, and that Sweeney met with his probation officer the following day.[19] There is insufficient evidence, therefore, to establish that, in the circumstances, the alleged undisclosed evidence was indeed exculpatory.

Also, as we have counselled, the "proper route for [a] defendant to obtain prior convictions of prospective witnesses from the Commonwealth is by requesting the judge to order the probation [service] to produce them." Commonwealth v. Martinez, 437 Mass. 84, 95 (2002), citing Mass. R. Crim. P. 14 (a) (2), 378 Mass. 874 (1979). The trial judge here offered to help the defendant in that regard at the outset of trial. And while the record reveals that the prosecutor agreed to assist when defense counsel alerted the trial judge to the fact that he "may" need to ask the probation service to "run off some records" on "some people," there is insufficient evidence to suggest that anything

---

[19] Wildgrube wrote a report documenting that he served Sweeney with a subpoena to appear for the defendant's trial while Sweeney was meeting with his probation officer on April 20, 2007. As the defendant would have it, this is proof of both the prosecutor's knowledge of the probation violation and coordination between the prosecution team and the probation service with respect to the alleged undisclosed deal. This assertion, however, appears to be based only on speculation.

was deliberately withheld, never mind that an alleged probation violation by Sweeney was purposely concealed. The same is true with respect to the defendant's claim that the prosecutor failed to produce Sweeney's complete criminal record from South Carolina.

There is no doubt that Sweeney was an important witness for the prosecution and that his testimony was helpful to the Commonwealth's case. But it is also true that several other witnesses provided similar testimony, i.e., that they were approached by the defendant following the murders and pressed to help him with an alibi. The jury also heard about Sweeney's extensive criminal record and his strong incentive to testify against the defendant to avoid being prosecuted, yet again, for selling crack cocaine. Accordingly, even if it could be established that Sweeney had additional incentive to cooperate, to avoid revocation of his probation or obtain leniency in South Carolina, the defendant has failed to establish that there is a substantial risk that the jury would have reached a different conclusion had that been disclosed. We are sure that such an error, if it even occurred, had no influence, or had but very slight effect, on the jury.

ii. Undisclosed Bogacz evidence. The defendant claims that the Commonwealth failed to disclose prior to trial that Bogacz had provided Gibbons with information many years earlier,

in the 1980s, in another case.  According to Gibbons's undisputed testimony at the evidentiary hearing on the motion for a new trial, however, he did not provide Bogacz with any promises, rewards, or inducements on that occasion and did not speak to prosecutors on Bogacz's behalf.[20]  The undisclosed information, therefore, was not exculpatory in nature and did not need to be disclosed.  Cf. Commonwealth v. Watkins, 473 Mass. 222, 232 (2015) (evidence of understanding or agreement between government and witness is exculpatory evidence and must be disclosed).

The defendant also asserts that the Commonwealth failed to disclose that Bogacz was the subject of a pending drug investigation at the time he testified at trial.  The sole basis for this assertion is a statement by a prosecutor, made at Bogacz's sentencing hearing one month after the defendant's trial, that there had been an investigation of drug use at the Hampshire County house of correction the last time Bogacz was detained there, and that Bogacz had refused to provide a drug screen.  As a result, the prosecutor was not certain that Bogacz would be welcomed at the facility.  It is not at all evident from this, however, that Bogacz was the subject of a pending drug investigation at the time he testified, or that the

---

[20] Gibbons testified on cross-examination at trial that he had known Bogacz "for quite some time."

prosecutor in the defendant's case was aware of it or that Bogacz had been promised leniency in the event that the drug investigation revealed he had engaged in further criminal activity.

Although he was not essential to the Commonwealth's case in light of all the other evidence connecting the defendant to the murders, Bogacz, being the only witness to testify that the defendant confessed to the murders, was not an insignificant witness. Still, the jury heard about his long criminal history and strong desire to testify against the defendant in return for leniency on his pending charges. He admitted on cross-examination that he could be a good liar; that there was no way for the jury to determine whether he was telling the truth; that he had cooperated previously, in 1993, to avoid doing "heavy time" on a charge; and that he would not hesitate to turn in his mother, father, sister, or brother to again avoid doing "heavy time," this time on his pending habitual offender charge. In sum, the jury already had ample evidence from which to question Bogacz's motives and credibility. As such, even if the undisclosed evidence was as the defendant suggests and had been disclosed, the defendant has not shown a reasonable possibility that it would have made a difference. Again, we conclude that it would have had no influence, or would have had very slight effect, on the jury.

iii.  <u>Undisclosed audio recording</u>.  Prior to trial, the
Commonwealth failed to produce the audio recording of the
defendant's interview with police on May 3, 2005, following his
arrest for the theft of the liquor bottle.  As the Commonwealth
concedes, this was a violation of its mandatory discovery
obligations.  See Mass. R. Crim. P. 14 (a) (1) (A) (i), as
amended, 444 Mass. 1501 (2005) (requiring production of "[a]ny
written or recorded statements, and the substance of any oral
statements, made by defendant").  The Commonwealth, however, did
not attempt to use statements from the May 3 interview at trial.
Nor has the defendant suggested that any exculpatory information
was contained in the interview.  Instead, he suggests that the
nondisclosure deprived him of the ability to point to his
invocation of his right to counsel during the May 3 interview
when he moved to exclude the statements made to Bogacz and
Sweeney.  However, the record reveals that the defendant was
armed with that information well before he moved to exclude his
statements to the two jailhouse witnesses.[21]  Moreover, even if

---

[21] When the defendant was arrested on May 3, 2005, he also
was cited for certain criminal motor vehicle infractions.  In a
December 27, 2006, memorandum of decision and order denying the
defendant's motion to dismiss those charges, a District Court
judge discussed the interview that took place at the district
attorney's office in Greenfield following the arrest:  "[Gibbons
had a] conversation with the defendant about another criminal
matter and informed him relative to this other matter of his
Miranda rights . . . .  At first the defendant said he wanted to

he had needed the audio transcript for that purpose, it is moot given our conclusion that Bogacz and Sweeney were not acting as government agents when the statements were made. No prejudice has been shown.

c. Denial of request for voir dire. The defendant next argues that he is entitled to a new trial because the trial judge refused his pretrial request for voir dire of Bogacz and Sweeney. More specifically, he argues that due process and the right to a fair trial require, upon request, a voir dire of any witness testifying pursuant to a cooperation agreement before being allowed to testify at trial because such a witness is inherently unreliable. This argument need not detain us long, for this court already has "recognized that testimony pursuant to a plea or cooperation agreement, founded on a promise of truthful cooperation, and the agreement itself are admissible" (quotation, citation, and alterations omitted). Commonwealth v. Cruz, 442 Mass. 299, 310 (2004) (rejecting defendant's argument that witnesses testifying pursuant to promises of consideration by Commonwealth should have been excluded on ground that testimony was "irretrievably unreliable"). We have, however, established guidelines for use when such a witness testifies to

---

talk. However, . . . Gibbons then received a telephone call from Bateman's attorney, who asked him not to talk to the defendant. As a result the questioning then stopped."

minimize any risk that the jury will believe the witness because the Commonwealth, in effect, appears to have vouched for the truthfulness of the testimony.  Id.  See Commonwealth v. Ciampa, 406 Mass. 257, 264-266 (1989).  The trial judge here properly followed those guidelines and instructed the jury on three separate occasions that Bogacz and Sweeney had a personal interest in the case that was different from the ordinary witness, that the Commonwealth had no greater ability than the jury to know whether Bogacz and Sweeney were testifying truthfully, that it was solely for the jury to decide whether those witnesses had been truthful, and that their testimony should be scrutinized with caution and weighed with great care. That is all that was required.

The trial judge denied the defendant's motion to exclude the testimony of Bogacz and Sweeney without conducting a voir dire, after finding that the submission in support of the motion was insufficient.  Having reviewed the submission, we cannot say that this constituted an abuse of discretion.  See Commonwealth v. Rodwell, 394 Mass. 694, 698-699 (1985), S.C., 432 Mass. 1016 (2000) (judge did not abuse discretion in denying motion to suppress without evidentiary hearing where affidavit presented no facts supporting theory of suppression).  As to Bogacz, the issue of a voir dire effectively became moot after he testified at trial and the trial judge, in response to the motion for a

new trial, subsequently held an evidentiary hearing on the issue whether he was a government agent.

With respect to Sweeney, the trial judge denied the request for an evidentiary hearing in support of the motion for a new trial after determining that, once again, the defendant had failed to establish that there was a substantial issue whether he was a government agent.  See Commonwealth v. Marrero, 459 Mass. 235, 240 (2011) (judge may rule on motion for new trial without evidentiary hearing if no substantial issue raised by motion or affidavits); Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001) (same).  See also Commonwealth v. Riley, 467 Mass. 799, 826 (2014) (motion judge who also was trial judge may use knowledge and evaluation of evidence at trial in determining whether to hold evidentiary hearing on motion for new trial).  Having reviewed the defendant's allegations concerning Sweeney, as discussed in part 2.b.i, supra, we cannot say that the trial judge committed "a significant error of law or other abuse of discretion" (citation omitted).  Upton, 484 Mass. at 162 (reversals for denial of evidentiary hearing on motion for new trial are "particularly rare").

3.  Perjured testimony.  The defendant contends that the prosecutor allowed multiple witnesses to commit perjury during the trial and failed to take steps to correct it.  "The

Commonwealth may not present testimony at trial 'which [it] knows or should know is false.'" Commonwealth v. Ware, 482 Mass. 717, 721 (2019), quoting Commonwealth v. Forte, 469 Mass. 469, 490 (2014). See Commonwealth v. Moore, 489 Mass. 735, 747 n.23 (2022). "Nor may the Commonwealth, 'although not soliciting false evidence, allow[] it to go uncorrected when it appears.'" Ware, supra, quoting Commonwealth v. Hurst, 364 Mass. 604, 608 (1974). However, "[m]inor inconsistencies do not constitute falsities." Forte, supra at 491. The prosecutor also does not have a "duty to try the defendant's case for him by attempting to impeach the testimony of the Commonwealth's own witnesses with . . . documents in the defense counsel's possession." Commonwealth v. Jewett, 442 Mass. 356, 363 (2004).

The defendant asserts that Gibbons lied, and the prosecutor failed to correct him, on multiple occasions during the trial. The trial judge, whose credibility determinations we defer to, found in his decision denying the motion for a new trial that, while Gibbons's testimony at trial and at the evidentiary hearing on the motion for a new trial "was not entirely consistent, the inconsistencies fail to evince dishonesty." Having reviewed the record, we cannot say that the trial judge's finding was clearly erroneous. For example, the defendant maintains that, on cross-examination, Gibbons lied when he answered "no" to the question whether Bogacz had ever called and

tried to get hold of him. By the time Gibbons testified, however, Bogacz had already taken the stand and acknowledged that he called Gibbons. The defendant also had received in pretrial discovery transcripts of the telephone calls Bogacz made to Gibbons but chose not to confront Gibbons with them. The defendant also claims that Gibbons lied on cross-examination when he denied that Bogacz had an agreement with the government, and that the prosecutor again made no effort to correct him. Only moments earlier, however, Gibbons had testified that he was aware of the agreement Bogacz had signed with the district attorney's office. Also, Bogacz already had testified extensively about his agreement. In short, there is no reason to believe that Gibbons was being deceitful on these and other occasions identified by the defendant.[22]

---

[22] The defendant also suggests that Gibbons lied when, on direct examination, he testified that four witnesses had "identified" the defendant's van as the one they had seen at the gasoline station when either shown a photograph of it or driven by the defendant's house to view it. In fact, the witnesses had expressed varying degrees of certainty: the van in the photograph looked "similar" to the one seen at the station; the van in the photograph "could be" the one and was the "same type and boxy" style; the van in the photograph was "recognized" as and "very well could be the van" seen at the station; and the van viewed in the defendant's driveway "looked very much like the same vehicle." All of this, however, came out during the testimony of the respective witnesses. On this occasion, defense counsel also confronted Gibbons on cross-examination with exactly what the witnesses had said. We have no concern, therefore, that the jury were misled.

At trial, the prosecutor also elicited testimony from another State police trooper to the effect that the defendant initially had agreed to provide police with the container of water Waryasz had given him in case he needed it for his radiator, but later claimed he could not find it. According to the defendant, the container had been found by police at the gasoline station, meaning the prosecutor's suggestion that he had concealed it was deliberately misleading. There was, as the defendant suggests, a plastic container visible on the counter where the cash register used to be in one of the police photographs taken at the scene, as well as testimony from one witness about a windshield washer fluid container being recovered from the same location. From this evidence, the defendant could have asked the jury to infer that this was the same container that Waryasz had provided to him. He did not. Even if he had, however, it is not clear that it would have been helpful, because there is no dispute that he told police he took the container with him when he left the station: "I said, can I take it and she said, yeah, go ahead and just take it. So I put it in the back of the van . . . ." Moreover, if either side had suggested that the bottle found on the counter was the container in question, it would not have been unreasonable for the jury to have inferred that the defendant left it there in his haste to flee the scene with the cash register. No matter, the trial

judge did not err when he found that the prosecutor's questioning of the State trooper did not deliberately mislead the jury.

Having reviewed the defendant's allegations of perjury, we have no concern that false or misleading testimony affected the judgment of the jury.[23]

4.  DiGiambattista instruction.  When the defendant was first interviewed by police on April 18, 2005, approximately the first hour of the interview was not audio recorded.  Instead, police drafted a written statement based on what the defendant revealed during that hour, which the defendant reviewed, signed, and then read aloud so that it could be audio recorded.  Both the recording and the written statement were admitted at trial.  As a result of the police's failure to audio record the initial hour of the interview, however, the defendant requested that the jury be instructed pursuant to Commonwealth v. DiGiambattista, 442 Mass. 423 (2004).  The trial judge agreed and provided such an instruction, but the defendant claims it was incomplete and failed to apprise the jury that they could consider the lack of a recording when trying to assess the reliability of testimony

---

[23] To the extent the defendant did not object at trial to the alleged false or misleading testimony, we have reviewed it for a substantial likelihood of a miscarriage of justice, see Commonwealth v. Woollam, 478 Mass. 493, 504 (2017), cert. denied, 138 S. Ct. 1579 (2018), and concluded that there was none.

regarding statements allegedly made by the defendant during the interview. We review for prejudicial error.[24] See Commonwealth v. Stuckich, 450 Mass. 449, 453 (2008) (where "issue was properly preserved, we review to determine whether we can be certain that the improper instruction did not influence the jury, or had but very slight effect" [citation and quotation omitted]).

In DiGiambattista, 442 Mass. at 447-448, we held, in an exercise of our supervisory powers, that

> "when the prosecution introduces evidence of a defendant's confession or statement that is the product of a custodial interrogation or an interrogation conducted at a place of detention (e.g., a police station), and there is not at least an audiotape recording of the complete interrogation, the defendant is entitled (on request) to a jury instruction advising that the State's highest court has expressed a preference that such interrogations be recorded whenever practicable, and cautioning the jury that, because of the absence of any recording of the interrogation in the case before them, they should weigh evidence of the defendant's alleged statement with great caution and care."

Here, the trial judge instructed the jury:

> "Now, our Supreme Judicial Court has expressed a preference that interrogations be recorded whenever practicable. An unrecorded statement does not present to the jury evidence

---

[24] The Commonwealth asserts that the defendant failed to preserve his objection to the DiGiambattista instruction after the charge to the jury. While the record is not altogether clear, it appears that the defendant raised an objection to the perceived defect in the instruction during the charge conference. We conclude, therefore, that the objection was preserved. See Commonwealth v. Prater, 431 Mass. 86, 97 (2000) (issue preserved where defense counsel requested instruction at charge conference but failed to object after instruction was not given).

of the totality of the circumstances, but instead only presents the jury with an abbreviated summary of those circumstances and the interrogating officer's recollection of the highlights of those circumstances. Consequently, when the Commonwealth introduces evidence of a defendant's statement that is a result of a custodial interrogation or an interrogation at a place of detention, and there is not, at least, an audiotape recording of the complete interrogation, the jury should use great caution when trying to assess the totality of the circumstances.

"You are advised that the absence of a recording permits, but does not compel, you, the jury, to conclude that the Commonwealth has failed to prove voluntariness beyond a reasonable doubt.

"If the Commonwealth satisfies its burden that the statement was made freely, voluntarily and as a product of his own free will and rational mind, then you may consider the statement in your evaluation of the evidence."

We have never required the use of precise language when providing a DiGiambattista instruction. See Commonwealth v. Barbosa, 457 Mass. 773, 801 (2010), cert. denied, 563 U.S. 990 (2011). Nor do we do so now. As noted above, we have required that a judge "tell the jury both that (1) the State's highest court prefers that custodial interrogations be tape recorded, whenever practicable, and (2) where there is not at least an audiotape recording of the complete interrogation, the jury should weigh the defendant's statements with great caution and care." Id. In addition, "[w]here voluntariness is a live issue at trial and the humane practice instruction is given, we also require that the jury be instructed 'that the absence of a recording permits (but does not compel) them to conclude that

the Commonwealth has failed to prove voluntariness beyond a reasonable doubt.'" Id. at 800 n.26, quoting DiGiambattista, 442 Mass. at 448. Here, while it would have been preferrable for the trial judge to have more clearly tied the warning to weigh unrecorded statements with "great caution and care" to the issue of reliability, as well as voluntariness, the instruction adequately conveyed that message and hit on all three points of emphasis from DiGiambattista. The message also had been conveyed throughout the trial. On cross-examination, Gibbons testified that it was a violation of office policy not to have recorded the interview, that he told the State police troopers conducting the interview to stop once he learned they were not recording it, and that there was no way for the jury to know the questions or responses without a recording. Defense counsel then repeated those points in closing argument.

The instruction satisfied DiGiambattista, and to the extent there were any even arguable deficiencies, we are certain that they did not influence the jury, or, at most, had but very slight effect.[25]

---

[25] We have not considered whether the April 18, 2005, interview of the defendant amounted to a custodial interrogation or whether the district attorney's office where it was conducted amounted to a place of detention. See DiGiambattista, 442 Mass. at 447 (preference for recording applies where confession or statement is product of custodial interrogation or interrogation occurs at "place of detention [e.g., a police station]").

5.  Prosecutorial misconduct.  The defendant claims that the prosecutor engaged in misconduct during closing argument. The claim is without merit.

The defendant claims that the prosecutor misstated the evidence by arguing to the jury that (1) the defendant's DNA was under Waryasz's fingernails; (2) the defendant had turned his van around before leaving the gasoline station to make it easier to load the cash register; and (3) Waryasz "put her hand on her abdomen in death and hug[ged] her child in death."  The evidence, however, established that (1) the defendant was "a potential contributor" to the mixture of DNA recovered from Waryasz's fingernails, with a random selection probability of one in 207,000; and (2) witnesses who observed the defendant's van parked in front of the station building had it facing in opposite directions, with the "paint guy" -- the last person to see it prior to the murders -- testifying that it was parked facing out, toward the street, meaning the large side door of the van was facing the building.  Clearly, therefore, the first two statements to which the defendant objects were reasonably grounded in the evidence.  See Commonwealth v. Lao, 460 Mass. 12, 21-22 (2011) (prosecutor entitled to suggest inferences to be drawn from evidence, which "need not be inescapable, just reasonable and possible").  The third statement is a closer call.

"[P]rosecutors are entitled to argue forcefully for the defendant's conviction" (citation and quotation omitted). Commonwealth v. Rutherford, 476 Mass. 639, 643 (2017). However, "an improper inference that unfairly invite[s] the jury to decide the case based on sympathy for the victim" cannot be tolerated. Id. at 646. Certainly, the prosecutor's statement suggesting that Waryasz was hugging her child in death had the potential to invite sympathy for the victim. Having said that, the evidence did establish that when Waryasz's body was found in the service bay, her right arm was down to her side, and her right hand was on her abdomen. Accordingly, while close, we cannot say that the remark crossed the line; it was properly inferred from the evidence and did not unfairly invite sympathy in a case that, inescapably, involved the murder of a pregnant woman.

The defendant further suggests that the prosecutor impermissibly commented on the defendant's prearrest, pre-Miranda silence by noting, for example, that the defendant failed to disclose his purchases of crack cocaine when, during his police interviews, he provided accounts of his whereabouts on the day of the murders. The argument, however, "fails for the simple reason that the defendant did not exercise his right to remain silent." Commonwealth v. Martino, 412 Mass. 267, 283 (1992). The prosecutor, therefore, was "entitled to comment on

the defendant's statement and to compare it to the evidence in the case."  Commonwealth v. Morales, 440 Mass. 536, 551 (2003).

6.  Change of venue.  Shortly before trial, the defendant moved, pursuant to Mass. R. Crim. P. 37 (b) (1), 378 Mass. 914 (1979), for a change of venue on grounds that pretrial publicity had been "so overwhelming and prejudicial" in Franklin County that he could not obtain an impartial trial.  The trial judge deferred ruling on the motion until he could determine whether there was an inability to empanel a jury, and then denied it, in a ruling issued from the bench, after the jury had been empanelled within two days.  In his motion for a new trial, the defendant again claimed that he had been "presumptively prejudiced" by the media coverage of his case, and, thus, that he was entitled to a new trial.  The trial judge again disagreed, this time in his written decision.  On appeal, the defendant challenges the trial judge's rulings.

"The Sixth Amendment and art. 12 guarantee the right of a criminal defendant to a trial by an impartial jury." Commonwealth v. Mack, 482 Mass. 311, 315 (2019), citing Commonwealth v. Toolan, 460 Mass. 452, 462 (2011), and Skilling v. United States, 561 U.S. 358, 377 (2010).  When a defendant believes that pretrial publicity has been so extensive as to violate this right and warrant a change of venue, he "has the burden to establish the 'solid foundation of fact' necessary to

support a grant of the motion." Commonwealth v. Hoose, 467 Mass. 395, 405 (2014), quoting Commonwealth v. McCowen, 458 Mass. 461, 476 (2010). "The mere existence of pretrial publicity, even if it is extensive, does not constitute a foundation of fact sufficient to require a change of venue" (citation omitted). McCowen, supra. "To establish prejudice stemming from extensive pretrial publicity or settled community opinion, the defendant must show either presumptive prejudice or actual prejudice." Hoose, supra at 405-406, citing Toolan, supra. Here, the defendant has not alleged that the pretrial publicity caused actual prejudice to infect the jury, only that it caused the jury to be presumptively prejudiced against him.

"A trial judge should exercise [the] power to change the venue of a trial with great caution and only after a solid foundation of fact has been first established" (citation and quotation omitted). McCowen, 458 Mass. at 476. At the same time, the trial judge has "substantial discretion" in deciding the motion, and we review his ruling for an abuse of that discretion. Toolan, 460 Mass. at 463. See Skilling, 561 U.S. at 378 n.11 (trial "court calls on the necessity of transfer are granted a healthy measure of appellate-court respect"). "In evaluating the risk of prejudice posed by pretrial publicity, we give careful attention to the evaluation of the trial judge, especially one who, as here, presides in the county where the

crime occurred and is familiar with the nature and pervasiveness of the pretrial publicity." McCowen, supra.

"Presumptive prejudice occurs when the jury pool in the community has been so tainted by pretrial publicity that the entire venire may be presumed prejudiced regardless of the specific voir dire procedures utilized." Hoose, 467 Mass. at 406, citing Toolan, 460 Mass. at 463. It "exists only in truly extraordinary circumstances," Toolan, supra, where the "trial atmosphere is . . . 'utterly corrupted' by media coverage." Commonwealth v. Entwistle, 463 Mass. 205, 221 (2012), cert. denied, 568 U.S. 1129 (2013), quoting Skilling, 561 U.S. at 380. While not exclusive, "[t]wo factors play a central role in creating the presumption of prejudice. First, the nature of the pretrial publicity, specifically whether it is both extensive and sensational, is a highly significant factor. Second, whether the judge was in fact able to empanel jurors who appear impartial is the factor of primary importance" (citations and quotation omitted). Hoose, supra. See Toolan, supra (identifying other possible factors, like size of community, content of news stories, time between peak media coverage and trial, and any evidence from verdict itself, such as acquittal on any charges). Here, the trial judge considered the relevant factors and concluded that the defendant had failed to sustain his burden of showing that the venire was presumptively

prejudiced by pretrial publicity.  Having reviewed the same record, we conclude that this was not an abuse of discretion.

The publicity was not extensive.  In support of his motion for a new trial, the defendant submitted a total of fifty-eight "articles" published prior to May 11, 2007, the day the jury empanelment was finalized.[26]  The articles, mostly from a local newspaper, appear to have been located through a computer archival search.  There is no evidence of how widely distributed any of the articles were.  Of the fifty-eight articles, thirty-six were published between May 4, 2005, the date of the defendant's arraignment on the liquor bottle-related charges, and August 24, 2005, days after he was arraigned in the Superior Court on the murder charges.  The others were published over the next twenty-plus months.  As the trial judge noted, "publicity is not extensive where the nature of the coverage becomes more factual and the frequency of coverage decreases in the time period between the crimes and jury empanelment."  Hoose, 467 Mass. at 406, citing Morales, 440 Mass. at 541.  Certainly, that was the case here.  Even in Franklin County, where it has been

---

[26] While media coverage continued during the trial, the judge questioned the seated jurors at the start of each day about exposure to publicity and instructed them at the end of each day to avoid reading, hearing, and talking about the case. Every day, the jurors confirmed that they had followed his instructions.  "Absent evidence to the contrary, jurors are presumed to follow the judge's instructions."  Toolan, 460 Mass. at 468 n.25.

suggested the population at that time was approximately 70,000, the publicity was not, as the defendant suggests, all-consuming and constant.  Cf. Skilling, 561 U.S. at 381.

The publicity also was not sensational.  "Publicity is sensational when it contains emotionally charged material that is gratuitous or inflammatory, rather than a factual recounting of the case."  Hoose, 467 Mass. at 407.  The articles consisted almost exclusively of factual recountings.[27]  They largely tracked events in the case, reporting on what was revealed in open court.  Many were logs of activity on all cases scheduled in a court on a given day, buried in which were extremely brief references to the defendant (or his wife).  The articles dedicated to the defendant's case, meanwhile, were full of redundant restatement of facts.  Some articles noted that Waryasz was pregnant, well-liked, and now missed by those close to her.  There also were references to the defendant's criminal history, his drug habit, and the withdrawal of his attorney. And while the defendant suggests that the pretrial publicity was sensational due, in part, to the fact that this was an interracial murder, only five of the articles either directly or

---

[27] Early on, in an article dated May 10, 2005, there was a report that vandals had painted the words "baby killer" on cars outside the defendant's house.  The alleged act was, without question, emotionally charged, gratuitous, and inflammatory. The article reporting on it was not.

indirectly referenced his race, and three of those references were in quotes from the defendant, his wife, and a third party who was protesting outside the court house on behalf of the defendant. As the trial judge rightly concluded, this mostly "fact-based publicity . . . is not the sort of sensational publicity that would give rise to a presumption of prejudice." Id., citing Morales, 440 Mass. at 540, and United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir.), cert. denied, 498 U.S. 845 (1990).

The defendant also failed to establish that it was practically impossible to empanel an impartial jury. "We have measured this practical impossibility by looking to the percentage of the venire that was dismissed for cause as a result of prejudice from exposure to pretrial publicity." Hoose, 467 Mass. at 407-408, citing Morales, 440 Mass. at 541. "Although we have not identified a specific percentage of dismissals that will trigger the presumption, we have held that dismissal of as much as forty-two per cent of the venire is not sufficient to give rise to a presumption that the entire venire was tainted by pretrial publicity." Hoose, supra at 408, citing Commonwealth v. Angiulo, 415 Mass. 502, 515 (1993). As the trial judge observed in his decision denying the motion for a new trial, "It took only two days to empanel [sixteen] jurors. In that process, [fourteen] of 150 potential jurors were excused

due to prejudice from pretrial publicity, and [the defendant] had four unused peremptory challenges."[28]  That is a rate of less than seven percent.  It is not a rate that would cause "a shadow of doubt [to] be cast over the remaining venire members such that the prejudice of the remaining venire members may be presumed."  Hoose, supra, citing Angiulo, 897 F.2d at 1181-1182.  The defendant has failed to establish presumptive prejudice.

7.  Juror impartiality.  The defendant argues that his right to an impartial jury was violated by the seating of a particular juror.  Following an individual voir dire with the prospective juror, the trial judge found him to be impartial.  When neither the Commonwealth nor the defendant exercised a peremptory challenge, the juror was then seated on the jury and, eventually, chosen as the foreperson.  "[W]here a defendant fails to challenge a juror for cause, the questions of the impartiality of that juror and the adequacy of voir dire are waived" (citation omitted).  Commonwealth v. Heywood, 484 Mass. 43, 45 (2020).  Therefore, "we review to determine whether there was error, and, if so, whether it created a substantial

_____

[28] "Generally, a defendant's failure to exhaust his peremptory challenges weighs against finding that prejudice necessitated a change of venue."  Toolan, 460 Mass. at 466 n.22, citing Morales, 440 Mass. at 543, and Delle Chiaie v. Commonwealth, 367 Mass. 527, 532 (1975).

likelihood of a miscarriage of justice." Commonwealth v. Perez, 460 Mass. 683, 689-690 (2011).

We begin with the relevant parts of the voir dire. After the prospective juror confirmed that he would be able to keep an open mind, decide the case solely on the facts introduced during trial, and give both sides a fair trial, the following exchange took place:

Q.: "Would the fact that the [d]efendant is African-American and the alleged victims white affect your ability to decide this case fairly and impartially?"

A.: "No, it would not."

Q.: "Do you believe that African-American males are more likely to commit crimes than individuals from other racial or ethnic backgrounds?"

A.: "Yes, I believe they probably are."

Q.: "Why is that?"

A.: "By statistics, from what I've read; not just more likely to commit crimes, more likely to be victims. There apparently is more crime in the African-American community in my opinion."

Q.: "Having that information, would that affect your ability in deciding the facts in this case?"

A.: "No, no, because it doesn't have anything to do with this specific case."

Q.: "Now, are you conscious of any feelings of racial bias or prejudice which might tend to influence your decisions in this case?"

A.: "No."

The defendant claims that the trial judge erred, in responding to the prospective juror's answer regarding the likelihood of African-American males to commit crimes, by failing to conduct further inquiry to ensure that the prospective juror was impartial.  We disagree.

"The presence of even one juror who is not impartial violates a defendant's right to trial by an impartial jury" (citation omitted).  Commonwealth v. Ralph R., 490 Mass. 770, 780 (2022).  Accordingly, while a "trial judge is accorded considerable discretion in the jury selection process and his finding that a juror stands indifferent will not be disturbed except where juror prejudice is manifest," the judge "must be zealous to protect the rights of an accused" when seeking "to ferret out possible juror bias" (citation and quotation omitted).  Commonwealth v. Clark, 446 Mass. 620, 629-630 (2006).

In Commonwealth v. Williams, 481 Mass. 443, 448 (2019), we provided the following direction for trial judges:

> "Where a prospective juror has expressed or formed an opinion regarding the case, or has an interest, bias, or prejudice related to the unique situation presented by the case, the judge must satisfy him- or herself that the prospective juror will set aside that opinion or bias and properly weigh the evidence and follow the instructions on the law.  Otherwise, removal of the prospective juror is clearly appropriate in the interest that persons actually prejudiced not be seated on the jury even if it tends to skew an otherwise balanced panel.
>
> "Where, on the other hand, a prospective juror has expressed an opinion or world view based upon his or her

life experience or belief system, rather than asking him or
her to set it aside (which is difficult if not impossible
to do), a judge must determine whether, given that
particular opinion, the juror nevertheless is able to be
impartial in the case to be tried."  (Citations and
quotations omitted.)

Id. at 448-449.  The trial judge here conducted the voir dire
consistent with these directions.[29]

After the prospective juror disclosed his belief that
African-American males are more likely to commit crimes, the
trial judge did not ask him to set that belief aside but,
rather, asked whether, notwithstanding that belief, he would be
able to decide the case based on the facts.  He answered in the
affirmative.  The trial judge also asked whether he was aware of
feelings of racial bias or prejudice that might tend to
influence his decisions in the case, to which he answered in the
negative.  The trial judge, therefore, appropriately focused on
whether, given the prospective juror's particular belief, he
nevertheless would be able to be impartial in the defendant's
case.  Having done so, we cannot say that the trial judge, who
had the benefit of personally interacting with and observing the
prospective juror, committed an abuse of discretion, never mind
a substantial miscarriage of justice, in declaring him
impartial.  See Commonwealth v. Stroyny, 435 Mass. 635, 639

---

[29] We note that Williams was issued twelve years after the
trial judge conducted the voir dire here.

(2002) (decision whether to accept declaration of "juror that he or she is disinterested lies within the broad discretion of the trial judge"). See also Commonwealth v. Mattier (No. 2), 474 Mass. 261, 274-275 (2016).[30]

8. Third-party culprit evidence. At trial, the defendant offered evidence to suggest that an individual named Anthony Cox could have been the murderer and that police had not done enough to explore that possibility. The evidence was weak at best. The evidence was offered through the testimony of Cox's former girlfriend, who stated that she had been home cleaning her car on April 19, 2005, when Cox approached carrying license plates to his vehicle, a white Ford Explorer. She then opened the trunk of her car and he put them in. She never saw Cox's vehicle again.

Police had interviewed Cox on May 2, 2005, on a prompt from the defendant's wife. He was cooperative and voluntarily

---

[30] The defendant likens the prospective juror here to the one in Clark, 446 Mass. at 628-629, who disclosed during voir dire "that she believed African-Americans as a group were more likely to commit crimes because of their economic status than people of other racial or ethnic groups." In that case, we held that the prospective juror should have been excused for cause because, when asked whether her belief would affect her ability to be impartial, she said that it "would depend on the person's circumstances," and the trial judge did not ask further questions to clarify that "ambiguous" answer. Id. at 630. The answers of the prospective juror in this case unambiguously indicated that he could be impartial. Clark does not control here.

submitted a buccal swab and a palm print. His fingerprints did not match any found at the gasoline station. He also was excluded as a source of the DNA mixture found on Waryasz's fingernails. And while he "could have been a potential contributor of the minor DNA identified on" the ends of the ligature, the State police chemist who conducted the analysis testified that it was only at a random selection probability rate of one in two, meaning that Cox was among the fifty percent of the African-American population who could not be excluded as a potential contributor. There also was no evidence to suggest that Cox ever owned a dark-colored van, that a white Ford Explorer had ever been associated with the murders, that anyone had seen Cox at the gasoline station on April 16, or that anyone had described an individual matching his height and weight as having been there that day.

Against that backdrop, the defendant argues that the trial judge erred when he refused to allow Cox's former girlfriend to testify that, at unspecified times, Cox verbally threatened her, including threatening to kill her, and once choked her with his hands. To admit prior bad acts of an alleged third-party culprit, a defendant must show that "the acts of the other person are so closely connected in point of time and method of operation as to cast doubt upon the identification of the defendant as the person who committed the crime. In addition,

the shared act must be 'particularly distinguishing,' rather than commonplace or ordinary" (citations, quotation, and alteration omitted). Commonwealth v. Hunter, 426 Mass. 715, 716-717 (1998). Having reviewed the issue independently, as the exclusion of third-party culprit evidence is of constitutional dimension, see Commonwealth v. Conkey, 443 Mass. 60, 66 (2004), S.C., 452 Mass. 1022 (2008), we concur with the trial judge; the alleged acts of domestic or relationship abuse were not connected clearly either in time or in method to the acts at issue here, namely, strangulation with a ligature in aid of a robbery.

Subsequently, the defendant included in his motion for a new trial the ground that he had newly discovered evidence of further violence on the part of Cox. Specifically, in 2017, ten years after the defendant's trial, the defendant's investigator spoke with a woman who reported that Cox had assaulted and raped her because he suspected she was an informant and threatened to kill her because she was a witness against him. According to the investigator's report, the woman alleged that Cox choked her, pressed a screwdriver to her neck, and punched her during the rape. Records indicate that Cox was indicted in connection with the incident on November 18, 2005, and later pleaded guilty to indecent assault and battery, assault and battery, and threatening to commit a crime. At the plea hearing, however,

the prosecutor made no reference during the presentation of the anticipated evidence to Cox having choked the victim, and Cox did not admit to having done so.

"Where a defendant moves for a new trial on the ground of newly discovered evidence, the defendant must show that the evidence is in fact newly discovered; the newly discovered evidence is credible and material; and the newly discovered evidence casts real doubt on the justice of the conviction" (citation and quotations omitted). Commonwealth v. Teixeira, 486 Mass. 617, 640 (2021). The trial judge concluded that, as with the prior evidence he had excluded at trial, the defendant had not shown that the "newly discovered" evidence of Cox's assault and battery was so closely connected in time and method to the acts at issue here. See Hunter, 426 Mass. at 716-717. Again, we concur. The newly discovered evidence was not material and does not cast genuine doubt on the justice of the defendant's conviction. See Teixeira, supra. The trial judge, therefore, did not abuse his discretion or commit some other error of law in denying the request for a new trial. See Moore, 489 Mass. at 749 (identifying standard of review).[31]

---

[31] The defendant argues that the trial judge erred in not ordering a new trial based on newly discovered evidence that the defendant suggests points to a member of Waryasz's family as the murderer. He also argues that the trial judge erred by denying the request without conducting an evidentiary hearing. The

9.  <u>Armed robbery</u>.  Except where a conviction of murder in the first degree is based on a theory in addition to a theory of felony-murder, a separate conviction of an underlying felony is duplicative of the felony-murder conviction.  See <u>Commonwealth</u> v. <u>Lopes</u>, 455 Mass. 147, 148 (2009); <u>Commonwealth</u> v. <u>Brum</u>, 441 Mass. 199, 200 n.1 (2004).  The defendant's conviction of murder in the case of Waryasz was based on an additional theory, but the conviction of murder in the case of Hall was not.  As the Commonwealth concedes, therefore, the armed robbery conviction is duplicative and must be vacated, and the charge must be dismissed.

10.  <u>Review under G. L. c. 278, § 33E</u>.  The defendant suggests that the evidence of his guilt was "not overwhelming" but, rather, "either explained by him, or conspicuously absent, even contradicted."  He also suggests that the trial was so "infected" with errors as to have denied him due process and created a substantial risk of a miscarriage of justice.  We disagree in all respects.  Having reviewed the entire record under G. L. c. 278, § 33E, we discern no basis to set aside or

---

trial judge denied the requests, having found the defendant's claim to be "specious" and "no more than speculation heaped upon speculation, without any substantial basis in fact."  We could not agree more; the alleged newly discovered evidence is so speculative as to not bear repeating here.  The trial judge did not abuse his discretion or commit some other error of law in either denying a new trial, see <u>Moore</u>, 489 Mass. at 749, or an evidentiary hearing, see <u>Upton</u>, 484 Mass. at 162.

reduce the verdicts of murder in the first degree or to order a new trial.[32]

Conclusion. For the foregoing reasons, we affirm the convictions of murder in the first degree and the order dated August 30, 2019, denying the defendant's first motion for a new trial, and we vacate and set aside the conviction of armed robbery. The matter is remanded to the Superior Court for dismissal of the armed robbery indictment.

So ordered.

---

[32] The defendant has identified several "substantive errors" that he suggests were "compounded by ineffective assistance of counsel" and require a new trial, discovery, or an evidentiary hearing. Many of these arguments are moot given our findings and conclusions elsewhere in this opinion. To the extent that these arguments have not been discussed, they were not overlooked; we have considered them carefully and concluded that they lack merit and do not warrant further discussion.